In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-3940

GORDON E. SUSSMAN,

*Petitioner-Appellant*,

*v.*

LARRY JENKINS,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:09-cv-00035-bbc—**Barbara B. Crabb**, *Judge*.

ARGUED APRIL 21, 2010—DECIDED APRIL 1, 2011

Before CUDAHY, RIPPLE and HAMILTON, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Gordon E. Sussman was charged in Wisconsin state court with multiple counts of possession of child pornography, two counts of repeated sexual assault of the same minor and two counts of exhibiting harmful material to a minor. A jury convicted Mr. Sussman on the child pornography and sexual assault charges, but acquitted him of the harmful-material counts. After exhausting avenues of review in state court, Mr. Sussman filed an application for a

writ of habeas corpus under 28 U.S.C. § 2254 in the United States District Court for the Western District of Wisconsin, challenging his convictions for child sexual assault. The district court denied Mr. Sussman relief, but granted him a certificate of appealability with respect to his claim that he received ineffective assistance of counsel at trial. We conclude that, in assessing the prejudice suffered by Mr. Sussman through the exclusion of the disputed evidence, the Wisconsin appellate court unreasonably applied the Confrontation Clause of the Sixth Amendment, as made applicable to the states through the Fourteenth Amendment. Accordingly, we reverse the judgment of the district court and remand the case with instructions to issue a writ of habeas corpus unless the State elects to retry Mr. Sussman.

# I

# BACKGROUND

## A. Facts

Mr. Sussman was convicted in Wisconsin state court of possession of child pornography and repeated sexual assault of the same minor, Scott. The testimony at trial established the following course of events.

### 1.

In 1998, Scott was in the third grade at West Middleton Elementary School, which Mr. Sussman's children also had attended. At the request of the principal, Mr. Sussman

became a mentor to Scott. In this role, he would come to school and help Scott with his work. However, they also would spend time together outside of school; initially, these activities included biking, canoeing and kayaking. A few times per month, Mr. Sussman took Scott to Rutabaga, Mr. Sussman's business. Scott testified that, when he was at Mr. Sussman's office, they would view pornographic pictures. Scott also testified that, when viewing pornography, he or Mr. Sussman masturbated each other. These sexual activities took place in other places as well; in all, Scott estimated that they masturbated each other "[p]robably over 50 [times]." Tr. 230.[1]

In 1999, Mr. Sussman ceased to mentor Scott. The circumstances surrounding the termination of the formal mentoring relationship are unclear. It appears that Mr. Sussman had given Scott a book, which Scott took with him to school; at trial, Scott could not recall the name of the book. A teacher found the book and believed it was inappropriate for school. Although the school mentoring relationship ended, Mr. Sussman continued to see Scott outside of school.

In October 2000, Scott moved from Wisconsin to Indiana and lived there for about a year and a half. He saw Mr. Sussman only occasionally during this period. In April 2002, Scott moved back to Wisconsin to live with his sister. Shortly after arriving there, Mr. Sussman

---

[1] Tr. refers to the transcript of Mr. Sussman's jury trial in Wisconsin state court.

took Scott shopping and also brought him to Rutabaga to view pornography and to masturbate. Scott also related other incidents of sexual contact both before and after his return to Wisconsin.

In May 2002, Scott moved back to Indiana. Up until this point, Scott had not told anyone about the abuse because he "was embarrassed and . . . thought it [sexual contact] was right." *Id.* at 278. However, in July 2002, Scott told his mother, Joann McDonald, about the abuse. According to the testimony at trial, friends of McDonald, who had been abused themselves, advised McDonald that "Scott was acting like someone that had been sexually abused." *Id.* at 1097. McDonald related these discussions to Scott and instructed him: "[T]ell me honestly have you ever been, has anybody ever touched you or done anything to you that felt uncomfortable." *Id.* at 313. When Scott confirmed her suspicions, McDonald reported the abuse to the authorities. Mr. Sussman ultimately was charged in Wisconsin state court with sixteen counts of possession of child pornography, two counts of repeated sexual assault of the same minor and two counts of exhibiting harmful material to a minor.

**2.**

At trial, defense counsel's strategy was to cast doubt on Scott's credibility in two ways. Counsel first intended to expose the inconsistencies in the statements that Scott

had made to the police and to others.[2] Defense counsel also planned on introducing prior false allegations of sexual assault that Scott had made against his father.

**a.**

Mr. Sussman's counsel first confronted Scott with the inconsistent versions of events that he had related to investigating officers. Scott's first interview was with Mark Rochon of the Valparaiso, Indiana Police Department. After Scott recounted all of the incidents of abuse that he could remember, Officer Rochon advised Scott and his mother that none of these occurred within the jurisdiction of the Valparaiso Police Department. Defense counsel resumed his cross-examination of Scott by discussing that statement by Officer Rochon:

> Q. Do you recall that then, after you said just that's all that happened, the officer turned to your mother and said that because these occurred, none of these occurred within the jurisdiction of Valparaiso Police Department, he would tell her about the correct agency to contact; do you recall that?
>
> A. No.

---

[2] In his opening statement, counsel for Mr. Sussman stated that "the uncertainty of the charges . . . reflect[s] the vagueness of Scott's allegations, because he never told the story the same way twice. He has contradicted himself repeatedly . . . ." Tr. 118.

Q. And do you remember that after he said
that, you said oh, I just remembered that
an incident occurred at Inman's Recre-
ational Center; do you recall that?

A. Yes.

*Id.* at 316.

Defense counsel also brought to light how, only one
hour after speaking with Officer Rochon, Scott spoke
with Detective Horn and described the incident at
Inman's Recreational Center differently than he had
with Officer Rochon:

Q. And then do you recall telling Detective Horn
that Mr. Sussman picked you up in his red
Volvo 940 station wagon at approximately
11:00 a.m.?

A. I don't recall saying that.

Q. And you don't recall telling Officer Rochon
an hour earlier that it happened at night?

A. No.

. . . .

Q. And do you recall that after talking for a while,
you told Detective Horn that Mr. Sussman
didn't ask you to jack him off, but asked you
to give him a blow job; do you recall that?

A. Yes.

. . . .

Q. And do you recall telling Detective horn [sic] that occasionally you would perform oral sex on Mr. Sussman, and Mr. Sussman would perform oral sex on you?

A. No.

Q. And then do you recall telling him that on one occasion you thought it was in the Detroit area that Mr. Sussman had you sit on his lap and Mr. Sussman penetrated you anally?

A. Yes.

Q. And do you recall telling the officer additionally, at that time, that Mr. Sussman mentored several other children at the West Middleton Elementary School, and that you thought he was molesting them too?

A. No.

*Id.* at 321-24.

After questioning Scott about the interview with Detective Horn, defense counsel moved on to inconsistencies in statements that Scott had made on the following day to an officer in Madison, Wisconsin.

Q. And do you recall that Officer Martin asked you the very next day, after talking to Officer Rochon and Detective Horn, whether Mr. Sussman was mentoring anybody else, and that you said no; you recall that?

A. No, I don't.

Q. And do you recall that Officer Martin said to you the very next day, after you spoke to Detective Horn, if you were ever anally assaulted during your contacts with Mr. Sussman, and you said no; you recall that?

A. Yes.

*Id.* at 324-25. Defense counsel then probed inconsistencies in Scott's recounting of events during an interview with Jennifer Sutton of Safe Harbor, which had occurred the day after his discussions with the Madison police. Scott informed Sutton that no "blow jobs" had occurred, but that anal sex had occurred. *Id.* at 330-31. Other information provided to Sutton was new as well:

Q. Now, do you recall that on the 9th when you talked to Officer Martin, you told him of two occurrences when Mr. Sussman had you watch pornography on the computer; is that correct?

A. Yes.

Q. And the very next day you told Miss Sutton that it happened over 50 times; is that correct?

A. Yes.

*Id.* at 331-32. Scott also admitted that he told Officer Martin about four instances of sexual assault, but told Sutton that "it was 50 incidents" and "whenever I was with him." *Id.* at 333-34 (internal quotation marks omitted).

In addition to exposing inconsistencies in Scott's statements, counsel for Mr. Sussman called numerous wit-

nesses to testify to Scott's general lack of regard for the truth. *See id.* at 743 (James Pippitt, former employee of Mr. Sussman, testifying that "Scott was truthful only insofar as it would help him along"); *id.* at 1836 (Kim Varian, Scott's cousin, testifying that she did not think Scott was a "truthful person"); *id.* at 1846 (Scott's uncle testifying that Scott was a "schemer"); *id.* at 1893 (Barbara O'Connor, an acquaintance of Scott's mother, testifying that Scott's quality for truthfulness was "very poor"); *id.* at 1905 (Edward Fox, Scott's former neighbor, testifying that Scott "wasn't very truthful"); *id.* at 1912-13 (Diane Boles, Scott's former teacher, testifying that Scott was "manipulative and precocious" and "not always truthful"); *id.* at 1931 (Patrick Kinney, Scott's former principal, "recall[ing] situations where [he] felt that Scott struggled between fact and fiction"); *id.* at 1953 (Darren Bush, former employee of Mr. Sussman, testifying that Scott "doesn't know what truth is").

## b.

Defense counsel not only attempted to cast doubt on Scott's veracity generally, but he attempted to show that Scott previously had levied false allegations of sexual assault to get attention and in retaliation. Specifically, defense counsel inquired whether Mr. Sussman was the first person whom Scott had accused of sexual assault. Counsel's attempts to elicit testimony on this subject drew immediate objections from the state's attorney. The objection initially was overruled.

Mr. Sussman's counsel then continued with his questioning:

> Q. You made such an allegation [of sexual assault] against your father; is that correct?
>
> A. Yes.
>
> Q. You once threatened your father to accuse him of sexual assault if he didn't let you ride your bike in the street; is that correct?
>
> A. No.
>
> Q. You also, during the course of a custody proceeding in which your mother and father were fighting over custody of you, made an allegation, while you were in the Madison Meriter Hospital psychiatric ward, that your father had sexually abused you; is that correct?
>
> A. I did not say that in that phrase.
>
> . . . .
>
> Q. Did you tell the people at the Meriter Hospital psychiatric unit that your father had inappropriately touched you sexually when you were in the shower?
>
> A. No.
>
> Q. All right, Scott. You tell me what you think you said to them.
>
> A. I told them, they had asked me if I can remember anything in my life that somebody had touched me appropriately—or done anything. And I told them that what I remember is my

> dad taking a shower with me and him helping me bathe. That's what I remember telling them.
>
> . . . .
>
> Q. Is that correct, did I understand you correctly that you were asked this in a context of a question about inappropriate touching?
>
> A. Yes.
>
> . . . .
>
> Q. It is something which you repeated over a year later to Bryce Mitchell;[3] is it not?
>
> A. I guess so.
>
> Q. Yeah. And when you repeated it to Bryce Mitchell over a year later—

*Id.* at 354-56. At this point, the prosecutor objected on grounds of physician-patient privilege. The jury was sent out of the room, and the court overruled the objection.

While the jury was out of the room, however, the prosecutor returned to the issue of prior untruthful allegations. For the first time, the prosecutor argued that, according to sections 971.31 and 972.11(2) of the Wisconsin Statutes, any testimony concerning prior false accusations of sexual assault was improper absent a *pretrial* determina-

---

[3] Bryce Mitchell was a counselor who treated Scott on an inpatient and outpatient basis.

tion of admissibility.[4] The court agreed that the issue had

---

[4] Section 971.31 of the Wisconsin Statutes provided, in relevant part:

> (11) In actions under s. 940.225, 948.02, 948.025, or 948.095, evidence which is admissible under s. 972.11(2) must be determined by the court upon pretrial motion to be material to a fact at issue in the case and of sufficient probative value to outweigh its inflammatory and prejudicial nature before it may be introduced at trial.

Wis. Stat. Ann. § 971.31(11) (West 2007).

For its part, section 972.11 of the Wisconsin Statutes (the "rape shield law") provided, in relevant part:

> (2)(a) In this subsection, "sexual conduct" means any conduct or behavior relating to sexual activities of the complaining witness, including but not limited to prior experience of sexual intercourse or sexual contact, use of contraceptives, living arrangement and life-style.
>
> (b) If the defendant is accused of a crime under s. 940.225, 948.02, 948.025, 948.05, 948.06, or 948.095, any evidence concerning the complaining witness's prior sexual conduct or opinions of the witness's prior sexual conduct and reputation as to prior sexual conduct shall not be admitted into evidence during the course of the hearing or trial, nor shall any reference to such conduct be made in the presence of the jury, except the following, subject to s. 971.31(11):
>
>> 1. Evidence of the complaining witness's past conduct with the defendant.

(continued...)

"not been determined prior to trial, and so the Court is wrong. The Court will sustain his objection." *Id.* at 365. After further exchanges, the court stated, "I'm not sure how . . . we can hold a pretrial hearing during the middle of trial," and granted the motion to strike any reference to Scott's statements to Mitchell. *Id.* at 367. In light of the court's ruling, Mr. Sussman's counsel made the following offer of proof:

> And I can tell the Judge I am prepared to show that he made such an allegation of his father, against his father. That he repeated it on two occasions; once to Detective Maida and Jennifer Anderson, from Child Protective Services; and once to Bryce Mitchell. And that there was a third occasion where this was discussed with his mother present with Detective Frey, and that his mother in his presence said that he had admitted to her that this was a false allegation because he was upset with his father and that he, [Scott,]

---

[4]  (...continued)

    2.  Evidence of specific instances of sexual conduct showing the source or origin of semen, pregnancy or disease, for use in determining the degree of sexual assault or the extent of injury suffered.

    3.  Evidence of prior untruthful allegations of sexual assault made by the complaining witness.

Wis. Stat. Ann. § 972.11(2)(a)-(b) (West 2007).

did not deny it when that was stated in his pres-
ence.

*Id.* at 370. In a Supplemental Offer of Proof filed with
the trial court, Mr. Sussman provided the following
information in support of his efforts to introduce prior
false allegations of sexual assault: (1) that an investiga-
tion of possible abuse took place in 1998 based on
Scott's reporting of inappropriate touching by his
father; specifically, his father had "touch[ed] his private
parts," commented that "it's growing and it'll be as big
as mine," patted Scott's buttocks and "told him not to
tell anyone," St. R.151 at 2 (internal quotation marks
omitted);[5] (2) that, if called to testify, Scott's father
would state that, in 1998, "Scott had told a therapist
that [his father] had molested him," that a restraining
order was subsequently entered against Scott's father,
that (after authorities determined the allegations were
unsubstantiated) Scott went to live with his father, and
that Scott later apologized to his father in 2001, stating
that "*he was only trying to get attention,*" *id.* (emphasis
added); (3) that, if called to testify, Scott's cousin
would state that, "[w]hile Scott was living with me[,]
I confronted him about the accusations and threats he
had made against his dad" and that "Scott admitted to
me that he had made the accusation against his dad
because *he was angry with him*" and because "[h]e *felt
abandoned by his dad*," *id.* at 3 (emphasis added); and (4) that

---

[5] St. R. refers to documents taken from the state trial-court
record.

a report from Detective Bruce Frey recounted that Joann McDonald, Scott's mom, had stated that any earlier allegations that Scott had made were "merely . . . to *get his father's attention* and that he wanted his father more in his life," *id.* at 5 (emphasis added).

When the jury returned to the room, the court instructed: "You are to disregard and strike from the record any reference that was made with respect to a false claim of sexual assault repeated to a Bryce Mitchell. . . . You are not to use it in your deliberations." Tr. 374. Although counsel was precluded from asking about prior false allegations of sexual assault, counsel did cross-examine Scott about threats he had directed at his uncle. Scott admitted that, while staying with his uncle, Scott had threatened to call 911 to report abuse; however, Scott claimed that he made this threat because his uncle slapped him.

Counsel next explored Scott's discussions with his counselor, Bryce Mitchell:

> Q. So during all this period of time, this span of time that you say Mr. Sussman was assaulting you and showing you pornography, you were meeting with her on a regular basis; is that correct?
>
> A. Yes.
>
> Q. And you met with her often and came to trust her; is that correct?
>
> A. Yes.

. . . .

Q.  And you came to trust her with very intimate details about your life; is that correct?

A.  For the most part, yes.

. . . .

Q.  Have you discussed Gordon Sussman with her often; is that correct?

A.  Yes.

Q.  And you were asked directly whether Gordon Sussman ever did anything sexual with you; is that correct?

A.  I don't recall.

Q.  Do you recall unequivocally stating to Bryce Mitchell that he did not?

A.  I don't.

Q.  And if you said such a thing, would you have been lying to Bryce Mitchell?

. . . .

A.  Yes.

*Id.* at 377-79.[6]

---

[6]  Although counsel for Mr. Sussman could not pursue the false allegations of sexual assault that Scott made against his father, defense counsel did ask Scott about other false allega-

(continued...)

In between witnesses on the fourth day of trial and outside the presence of the jury, Mr. Sussman's counsel noted for the record that he had given the court a memorandum addressing the court's "prior ruling on whether we can go into a . . . prior false allegation. If Ms. McDonald [Scott's mom] testifies, that will be an issue during her testimony." *Id.* at 871-72. In that memorandum, Mr. Sussman responded to the State's objection that the false-accusation testimony was barred because counsel had failed to seek pretrial determination of admissibility. Mr. Sussman explained that the objection should be overruled because (1) "the accused's right to confrontation and to present evidence overrides the procedural requirement for a pretrial determination of the admissibility of the evidence [under the Wisconsin statute]"; (2) the testimony "is not properly subject to Wis. Stat. §§ 971.31(11) and 972.11(2)(b), as the evidence demonstrates a <u>lack</u> of prior sexual conduct"; (3) "failure on the part of defense counsel to seek a pretrial ruling on this issue does not prejudice the State by reason of surprise,"

---

[6] (...continued)

tions that he had made against Mr. Sussman; Scott testified accordingly:

    Q.  But nonetheless you [Scott] told one of the detectives you talked to early on, Detective Horn, that Mr. Sussman was mentoring at least three others and sexually molesting them; is that correct?

    A.  Yes.

Tr. 436.

but exclusion could prejudice the defendant and provide a ground for reversal of the conviction; and (4) "the evidence is probative and relevant and satisfies the prerequisites for admission." St. R.180 at 1-2. With respect to the first argument, Mr. Sussman's counsel cited *State v. Pulizzano,* 456 N.W.2d 325 (Wis. 1990), and *Davis v. Alaska*, 415 U.S. 308, 320 (1974), for the proposition that "the State's interest in protecting a witness cannot require yielding of so vital a constitutional right as the effective cross-examination of an adverse witness." St. R.180 at 7-8 (internal quotation marks omitted). The supporting papers also anticipated, and responded to, arguments that there were no prior false accusations, *see id.* at 14-15 ("Scott has admitted the falsity of his claims to his father and to child protective services."), and that the false accusations were not relevant, *see id.* at 16 ("Evidence demonstrating the complainant's bias, credibility and truthfulness is basic to the prosecution and defense of criminal charges.").

Immediately prior to McDonald's testimony, Mr. Sussman's counsel stated his intent to ask about Scott's admission of a prior false allegation of sexual assault against his father, as well as Scott's failure to dispute his mother's statement to that effect. The prosecutor again noted that a pretrial motion was required. Furthermore, the prosecutor did not believe that the evidence was admissible under Wisconsin's rape shield law.[7] In the prosecutor's view, "that's why we needed the hearing for you to have all of those facts, because it's at

---

[7] *See supra* note 4.

the time of hearing all those facts that you decide whether its going to be even probative at all on anything in this case." Tr. 978. The court then scheduled time the following morning to hear each side.

At the hearing, Mr. Sussman's counsel argued that, although the evidence was relevant on its face, its probative value had increased as a result of testimony Scott had given at trial. Specifically, it rebutted Scott's statement that he did not reveal the abuse by Mr. Sussman prior to 2002 because he thought it was "right." Counsel stated:

> If Scott [last name deleted] made a prior allegation of sexual abuse, if, as Scott [last name deleted] claims, he didn't allege sexual abuse, but alleged only that his father touched him, however one chooses to view that testimony the evidence will show, as is supported by our written offer of proof and the documentation, that having made that allegation, an investigation was launched. Child Protective Services sent a worker and a police officer to discuss this with him, the guardian ad litem in the then current custody proceeding did an investigation and discussed this with him, and so certainly would have impressed upon Scott [last name deleted] the import of such an allegation and the import of such conduct.
>
> And it is a fair inference, . . . if not stated fact, that by the end of that, Scott [last name deleted] knew that such an allegation caused people trouble. That fact, coupled with the additional fact that he admitted subsequently to his father, to his

mother, and to his aunt—or cousin, rather, with whom he was living—that he had made the allegation falsely to get his father's attention, strikes at the heart of the notion which [Scott] put forward on the stand that I didn't know such conduct was wrong; i.e., "I thought it was right." So it is relevant to impeach the testimony of [Scott].

*Id.* at 1010-12. The court agreed that the evidence was relevant, but stated that it "ha[d] a problem with the method by which you may be able to go about doing it." *Id.* at 1018.

In response, the prosecutor argued that

[e]xclusion of this evidence is justified as a sanction for the defendant's failure to comply with discovery under 971.31(11) of Wisconsin statutes. . . . The defendant seeks to introduce this evidence that is potentially admissible under part of the rape shield law . . . . [I]t must be determined by the court upon a pretrial motion. *He attempts to now argue that he can evade that law claiming that his constitutional right trumps the procedural requirements of the statute.*

*Id.* at 1023 (emphasis added). The prosecutor also believed that the State was prejudiced by Mr. Sussman's attempt to introduce these prior statements. The prosecutor contended that counsel's failure to bring the pretrial motion was a "deliberate and willful tactical decision, not withstanding [sic] their denial[,] to ambush the State with this evidence at trial." *Id.* at 1025. In the prosecutor's view, counsel's "mere invocation" of the

defendant's right "to confront his accusers . . . d[id] not overcome the countervailing public interest of the integrity of the adversary system." *Id.* at 1026. The prosecution also maintained that, in fact, Scott had not levied a false accusation of sexual assault against his father, that the prior false allegation was too remote in time to be relevant, and, finally, that even if the evidence of false accusations were admissible, Mr. Sussman should not be allowed to use extrinsic evidence to prove those allegations.

The trial court then framed the issue in terms of Mr. Sussman's right to cross-examine Scott on his statement that the sexual contact between him and Mr. Sussman "was right." The court stated:

> It's the question as to whether or not he gets to rebut the idea that "I thought it was right," is necessary to the case. I think that probably that prong is correct. It may be very necessary. And is the probative value of the evidence outweighed by its prejudicial effect.
>
> It seems to me that, in the fairness of this matter, I think it would be appropriate to allow inquiry of [Scott's mother] as to whether or not Scott [last name deleted] had ever made an allegation, or made a statement about inappropriate touching. Typically, I think that would or should only come through the complaining witness. In some ways it was addressed. I think you are entitled to show that he had a foundation for knowing that the acts complained of in this case were inappropriate, they were not right, they were not normal.

And I will permit you to do that, but not permit you to go any further with respect to that, however. . . . [T]hat's the ruling. If you want clarification, he can ask whether or not she is aware that he [ha]s ever made a prior allegation about inappropriate touching. And if she knows, she can answer.

*Id.* at 1047-48. At this point, the prosecutor interrupted to get further clarification of the court's ruling:

[THE PROSECUTOR]: Your Honor, just to get a clarification under what statu[t]e you believe that that's admissible when we have the language in 972.11(2)(b).[8]

THE COURT: I'm not sure that—I'm not—and I guess I look at it and say he offers it under rape shield, I'm not sure that it is sexual conduct of the child. And so I don't, I guess I look at it and say, I say that it's not squarely under 972.11.

[THE PROSECUTOR]: Then isn't it under 906.08?

THE COURT: 906.08,[9] I agree that it should

---

[8]  *See supra* note 4.

[9]  Wisconsin Statutes section 906.08 provides:

(1) Opinion and reputation evidence of character. Except as provided in s. 972.11(2), the credibility of a witness may be attacked or supported by evidence in the form of reputation or opinion, but subject to the following limitations:

(continued...)

come in—

[THE PROSECUTOR]: Doesn't 906.08 begin by referring you in trials such as this?

THE COURT: That we should go back.

---

[9] (...continued)

> (a) The evidence may refer only to character for truthfulness or untruthfulness.
>
> (b) Except with respect to an accused who testifies in his or her own behalf, evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

(2) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than a conviction of a crime or an adjudication of delinquency as provided in s. 906.09, may not be proved by extrinsic evidence. They may, however, subject to s. 972.11(2), if probative of truthfulness or untruthfulness and not remote in time, be inquired into on cross-examination of the witness or on cross-examination of a witness who testifies to his or her character for truthfulness or untruthfulness.

(3) Testimony by accused or other witnesses. The giving of testimony, whether by an accused or by any other witness, does not operate as a waiver of the privilege against self-incrimination when examined with respect to matters which relate only to credibility.

Wis. Stat. Ann. § 906.08 (West 2000).

[THE PROSECUTOR]: Right.

THE COURT: And my theory of this is I don't want to, to the extent that I can, I guess the question is whether or not you're going to put Scott [last name deleted] back on the stand.

[DEFENSE COUNSEL]: I don't know yet.

I do want to say I understand the court's ruling. I just want to say for the record [the prosecutor] said I offered it under 906.08. You said I offered it under 972.11. That isn't what I said. I'm saying I'm offering it under 903 and 904.

THE COURT: Well, no—

[DEFENSE COUNSEL]: 904.03. I said, Your Honor, it was relevant. That's 904.03. And I said it shows motive and intent under 904.04.[10] That's

---

[10] Wisconsin Statutes section 904.04 provided:

(1) Character evidence generally. Evidence of a person's character or a trait of the person's character is not admissible for the purpose of proving that the person acted in conformity therewith on a particular occasion, except:

(a) *Character of accused*. Evidence of a pertinent trait of the accused's character offered by an accused, or by the prosecution to rebut the same;

(b) *Character of victim*. Except as provided in s. 972.11(2), evidence of a pertinent trait of character of the victim of the crime offered by

(continued...)

what I'm saying, is it's relevant, and it's relevant to rebut. I'm not, I understand your ruling. I just want the record to be clear that that's not what I was saying I was offering it under.

[THE PROSECUTOR]: But 904.04(b) Character of Victim starts out the same way. It's except as provided in 972.11(2), comma. It puts you right back to no comment about any evidence concerning the complaining witness's prior sexual conduct or opinions of the prior sexual conduct or the reputation as to prior sexual conduct shall be admitted into evidence during the

---

[10] (...continued)

> an accused, or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor;
>
> (c) *Character of witness.* Evidence of the character of a witness, as provided in ss. 906.07, 906.08 and 906.09.

(2) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. This subsection does not exclude the evidence when offered for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Wis. Stat. Ann. § 904.04 (West 2007).

course of the trial or hearing, nor shall any refer-
ence to such conduct be made in the presence
of the jury, except . . .

THE COURT: It's not sexual conduct. It's not
sexual conduct. It was . . . from what I have here,
that the patting on the butt, the washing of his
genitals by his father was for sexual gratification
of the father or the child. The fact is he made
a statement that he was touched inappropri-
ately—he thought he was touched inappropriately
by the father, which would indicate that he indi-
cated that he was patted on the butt, he was
touched [on] his genitals, and that he knew, that
there is reason to believe that he knew at the time
that he made that report that that was inappro-
priate. And he said that he thought the masturba-
tion that he performed on Mr. Sussman and
Mr. Sussman allegedly performed on him was
right. And this goes to say no, there's an independ-
ent basis for you to know that it wasn't right.
And he has a right to prove that or show that other
than just simply—I agree he has a right to show
that other than simply argue that that was a pre-
posterous statement by the child.

     . . . .

THE COURT: He can ask her whether or not he
has previously reported what he thought was an
unlawful touching and that would place us at that
point.

[THE PROSECUTOR]: Isn't that sexual conduct?

THE COURT: I don't think it's sexual conduct.

[DEFENSE COUNSEL]: May I make an inquiry on clarification. You're saying that's what I can ask her. I'm presuming though that what you're saying is I may prove that he has made such a prior allegation. I may not wish to do it through her.

THE COURT: Now you're getting back, if you're talking, you're getting back through extrinsic evidence.

[DEFENSE COUNSEL]: No. I understand what you're saying is I can show that he knew it was wrong conduct by showing that he had made prior allegations of inappropriate sexual conduct.

THE COURT: No, no.

. . . .

You can explain the question that he knew it was right. And you can do that through his mother, or you can do it through him. And you can elect now as to whether or not you are going to recall him and do it through cross-examination or do it through her.

. . . .

[DEFENSE COUNSEL]: I don't mean to exasperate Your Honor. But I'm not sure I'm being clear. So let me attempt. What I don't understand is this:

If it is relevant to show that he knew that such touching was wrong, while this was going on, and say, for example, Bryce Mitchell testified that we

talked about this during the period in question, and he knew that such touching was wrong, am I precluded from doing that?

THE COURT: Yes. Yes. The probative value of you going through Bryce Mitchell to go through your discussions with him, I think the prejudicial effect is far outweighed by the probative value. One, it will be cumulative of what I'm allowing you to obtain through the mother. And I simply think that it's, that the probative value is minimal at that point.

[DEFENSE COUNSEL]: I don't know that I will obtain it through . . . her. I don't know that she will be truthful, Your Honor. What you're saying is I have to prove my case during the course of the State's—through cross-examination of the State's witnesses.

THE COURT: No. No. You can prove your case. You can prove your case. Okay?

*Id.* at 1048-55.

In sum, the court did not revisit its initial ruling barring the prior false allegation evidence based on counsel's failure to raise the issue in a pretrial motion. Nevertheless, the court did allow Mr. Sussman's counsel, through cross-examination, to inquire whether Scott "previously [had] reported what he thought was an unlawful touching," *id.* at 1052, in order to rebut Scott's testimony that he did not report his sexual interaction with Mr. Sussman because Scott thought it "was right."

Mr. Sussman's counsel interpreted this ruling as not only precluding him from calling other witnesses, such as Scott's father or counselor, to establish prior false accusations of sexual abuse, but also as precluding him from calling Scott's counselor for any other purpose. As a result, defense counsel never sought to admit, and the jury never read, any of Mitchell's treatment notes. One treatment note from November 1999 contained the following statement: "I reported that cl [Scott] firmly denies any inappropriate contact w[ith] Mary or Gordy [Sussman]." R.206, Ex. 1.[11]

Near the end of trial, counsel for Mr. Sussman offered the testimony of Suzette Cyr, a friend of McDonald's with whom McDonald also had had a romantic relationship. Cyr testified that she and Scott were friends and that Scott had visited her at her home in Dallas during his Christmas vacation of 2003 and during summer vacation of 2004. Cyr testified that Scott had told her that "[i]t never happened. . . . This thing with Gordy. He never did it." Tr. 1861. Cyr admitted that, subsequent to this conversation, she had written McDonald threatening to expose Scott's statement unless McDonald repaid a loan

---

[11] Counsel for Mr. Sussman did mention Scott's denial to Bryce Mitchell during closing arguments. The State's objection to his statement was sustained by the court. Tr. (June 30, 2005) 119.

Although the jury was not able to see Mitchell's note or hear testimony from Mitchell, Mr. Sussman's counsel did elicit testimony from one of Scott's teachers as well as Scott's sister that Scott never had complained of abuse by Mr. Sussman. *See* Tr. 633, 961.

that Cyr had made to her. On cross-examination, she also admitted to writing other threatening letters to individuals with whom she had been romantically involved.

An acquaintance of McDonald, Barbara O'Connor, echoed the possibility that both Scott and McDonald may have had a financial motive in pursuing criminal action against Mr. Sussman. O'Connor testified that McDonald had anticipated filing a civil suit against Mr. Sussman and "get some money out of it." *Id.* at 1892. McDonald said she would use the money to "send[] Scott to college and some other things." *Id.* According to O'Connor, when Scott heard this, "[his] eyes light up, and he kind of had a smile . . . on his face" and said that "he could probably get a pool like Suzette had." *Id.* at 1892-93.

After a ten-day trial, a jury convicted Mr. Sussman on the child pornography and child sexual assault charges. He was acquitted on the charges of exposing Scott to harmful material.

## B. State and District Court Post-trial Proceedings

### 1.

On July 14, 2006, Mr. Sussman filed a petition for state postconviction relief pursuant to section 974.02 of the Wisconsin Statutes. *See* St. R.206. He alleged that his trial counsel had been constitutionally ineffective. Although the petition identified several grounds of ineffectiveness, only two are pertinent to the issues presently before us: First, Mr. Sussman's counsel had failed to file

a pretrial motion under section 971.31(11) of the Wisconsin Statutes that would have allowed Mr. Sussman to introduce evidence of Scott's prior false reports of sexual abuse. Specifically, Mr. Sussman argued that, "[i]f filed, that motion would have opened the door for Mr. Sussman to inform the jury that, on at least three prior occasions, [Scott] had falsely reported sexual abuse." *Id.* at 4. Second, counsel had failed to introduce the note made on November 24, 1999, by Mitchell that indicated that Scott had denied any inappropriate conduct by Mr. Sussman.

On November 30, 2006, the Circuit Court held a hearing to consider Mr. Sussman's petition. During the hearing, Mr. Sussman's counsel testified to his understanding of the evidence that Scott had made false allegations of sexual abuse against his father. Counsel explained that it was his "belief prior to trial . . . that [Scott] had made the allegation against his father in the context of the custody dispute, had subsequently recanted that allegation, and then subsequent to that, revived it when meeting with Bryce Mitchell." Tr. of Hr'g on Postconviction Motion at 29. Specifically, Mr. Sussman's trial counsel testified that he had a signed statement from Scott's father, in which Scott's father attested: "In December of 1998, Scott threatened to call the police if I did not let him ride his bike in the street. He said he would tell them that I had sexually assaulted him. In October of 1998, there was a civil restraining order against me; Scott had told the therapist that I had molested him." *Id.* at 76 (quotation marks omitted).

After child protective authorities determined that the claim was unsubstantiated, *see* St. R.151 at 15, Scott repeated this claim of inappropriate touching to Mitchell in October 1999, *see* St. R.206, Ex. 2 at 25, and again to Mitchell in March 2000, *see* St. R.206, Ex. 4. Mr. Sussman's trial counsel also testified that other evidence of a false allegation included an interview with Detective Frey. According to trial counsel, "Scott['s] [last name deleted] mother . . . told Detective Frey that on one occasion her son had made an allegation against his father for some type of sexual abuse, but had later indicated that he had lied to get his dad's attention and nothing really happened." Tr. of Hr'g on Postconviction Motion at 77.

Trial counsel explained that he would have used the false accusations both to impeach Scott's credibility and to rebut Scott's stated reason for not reporting the abuse by Mr. Sussman, namely that Scott thought the sexual contact was "right." *See id.* at 31. Trial counsel explained that his strategy was thwarted when the trial court sustained the prosecutor's objection to the evidence on the ground that trial counsel had failed to bring a pretrial motion. He further testified that the failure to do so was not a part of his strategy, but that "[i]t was an omission. I forgot." *Id.* at 32.

In his testimony, Mr. Sussman's trial counsel also addressed the potential impact of Mitchell's note. He explained that his strategy would have been to use the therapist's note to impeach Scott's credibility. However, because he misunderstood the breadth of the trial court's ruling with respect to Scott's psychiatric records, he failed to offer this evidence.

On March 8, 2007, the Circuit Court denied the petition. With respect to counsel's failure to file a pretrial motion to determine the admissibility of Scott's prior false accusations against his father, the court stated, "[w]hether properly phrased as a failure to show deficient performance or failure to show prejudice, it appears quite clear that trial counsel's failure to file a motion under Wis. Stat. § 971.31(11) can only constitute ineffective assistance if the motion itself would have had merit." St. R.224 at 6 (citing *State v. Swinson*, 660 N.W.2d 12, 26 (Wis. Ct. App. 2003)). The court further explained that to have merit, the motion would have had to satisfy three requirements: (1) the proffered evidence fits within section 972.11(2)(b)3 of the Wisconsin Statutes;[12] (2) the evidence is material to a fact at issue in the case; and (3) the evidence is of sufficient probative value to outweigh its inflammatory and prejudicial nature (the "*DeSantis* factors"). *Id.* at 6-7 (citing *State v. DeSantis*, 456 N.W.2d 600, 605 (Wis. 1990)).[13]

---

[12] *See supra* note 4.

[13] In *State v. DeSantis*, 456 N.W.2d 600, 602 (Wis. 1990), the Supreme Court of Wisconsin considered "whether the circuit court abused its discretion and violated the defendant's constitutional rights to confront witnesses and to present a defense when it precluded testimony the defendant proffered concerning the complainant's prior untruthful allegations." In *DeSantis*, the defense sought "to introduce at trial that the complainant had made prior untruthful allegations of sexual assault." *Id.* After a pretrial hearing, the court determined

(continued...)

[13] (...continued)
that, based on Wisconsin Statutes section 972.11 (the rape shield law), "the defendant could not cross-examine the complainant about her prior allegations of sexual assault on grounds of 'relevancy as well as remoteness.'" *Id.* at 604. Turning to this issue, the Supreme Court of Wisconsin opined that, under the rape shield law, the "first determination the circuit court must make under sec. 971.31(11) is whether the evidence falls within the exception set forth in sec. 972.11(2)(b)3, that is whether the defendant has established a sufficient factual basis for allowing the jury to hear the evidence that the complainant has made prior allegations of sexual assault that are untruthful." *Id.* at 605-06. With respect to this issue, the court "conclude[d] that the defendant should produce evidence at the pre-trial hearing sufficient to support a reasonable person's finding that the complainant made prior untruthful allegations." *Id.* at 606. "In other words," the court explained,

> in order to admit evidence of untruthful prior allegations of sexual assault, a circuit court must be able to conclude from the proffered evidence that a reasonable person could reasonably infer that the complainant made prior untruthful allegations of sexual assault. If the evidence does not meet this basic threshold, the circuit court must conclude that the evidence does not come within the exception provided by sec. 972.11(2)(b)3.

*Id.* at 606-07. The court believed that

> this reasonableness standard balances the public policies underlying secs. 972.11(2)(b)3 and 971.31(11).

(continued...)

---

[13] (...continued)

> The legislature sought to respond to claims that rules of evidence served to humiliate and degrade complainants by allowing the defendant to put the complainant on trial and served to deter complainants from pressing charges. The legislature also sought to protect a defendant's constitutional rights to a fair opportunity to defend and to a jury trial, as well as the defendant's interest in avoiding erroneous preliminary fact-finding by the circuit court. We conclude that the reasonableness standard strikes the appropriate balance between these competing policies and interests and is consistent with legislative intent.

*Id.* at 607. Therefore, according to the Supreme Court of Wisconsin, the *DeSantis* factors are an attempt by the legislature to balance policy concerns and federal constitutional rights.

However, the Supreme Court of Wisconsin also noted the independent obligation of trial courts to ensure that these factors are not applied in such a way as to run afoul of constitutional mandates, specifically the right to confront one's accusers:

> We recognize that the circuit court may not deny the defendant a fair trial or the right to present a defense by a mechanistic application of rules of evidence. *Davis v. Alaska,* 415 U.S. 308 (1973). The rights to confront witnesses and to defend are, however, not absolute and may bow to accommodate other legitimate interests in the criminal trial process. *Chambers v. Mississippi,* 410 U.S. 284, 295 (1973). The evidence declared inadmissible was of a prejudicial and inflammatory nature and of minimal, if any, probative value.

(continued...)

The court concluded that the motion would not have had merit because the false-accusation evidence failed to satisfy the first and third requirements. The evidence failed the first requirement because it did not describe a sexual assault: It described merely how Scott's father had touched Scott's intimate parts, but not that his father had touched Scott for purposes of sexual gratification or sexual degradation. The evidence failed the third requirement because its probative value was significantly outweighed by its prejudicial effect; the false accusations were "of a rather ambiguous nature, [were] temporally remote from the allegations against the defendant, especially considering the youth of the complaining witness, and contained vastly different surrounding circumstances." *Id.* at 8. On the other hand, the court continued, "[t]he potential for improper use and confusion by the jury, however, would have been unacceptably high. Extensive testimony regarding this alleged report of sexual abuse would likely have focused undue attention on the complaining witness' behavior in a situation quite unlike the one actually being

---

[13] (...continued)

   The exclusion of evidence of minimal, if any, probative effect in view of its highly inflammatory nature does not depart from general principles of the law of evidence or of constitutional law. We conclude that the circuit court did not abuse its discretion when it excluded the evidence and did not violate the defendant's constitutional rights.

*Id.* at 609 (parallel citations omitted).

tried." *Id.* Moreover, concluded the court, "even were this evidence admissible, . . . the Court is convinced that trial counsel's failure to present this evidence was not prejudicial. Significant evidence was actually presented regarding the complaining witness' propensity to lie. A temporally remote addition to this evidence would not create a reasonable probability of a different outcome." *Id.*

Turning to counsel's failure to offer the therapist's note, the court assumed that counsel's assistance had been deficient, but the court concluded that it was not constitutionally prejudicial for two reasons. First, trial counsel questioned Scott about his denial to the therapist, and Scott responded that, if he had made such a denial, he was lying. Thus, according to the court, the note would have added little else to Mr. Sussman's defense. Second, Scott's credibility was thoroughly examined in other ways, and the therapist's note would have been a minor addition to the impeachment of Scott.

Mr. Sussman appealed to the Court of Appeals of Wisconsin. He asserted that his Sixth Amendment right to effective assistance of counsel had been violated by his trial counsel's two deficiencies. *See* R.5, Ex. D at 20 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). With respect to the first deficiency—the failure to file the pretrial motion to determine the admissibility of the prior false claims evidence—Mr. Sussman disputed the circuit court's rationale that the motion would have been meritless. *Id.* at 23 (stating that "[i]f, at trial, the court had denied the timely motion, that ruling would have been grounds for reversal in this appeal"

because "the law permitted Mr. Sussman to introduce Scott's prior false accusation against his father"). Mr. Sussman contended that the evidence met the three *DeSantis* requirements because (1) Scott admitted at trial that he had previously accused his father of "sexual assault," which could have been confirmed by several witnesses, (2) the evidence was material because the court and prosecutor admitted that it was "important" and "crucial" and (3) the evidence had probative value. *Id.* at 24-28 (internal quotation marks omitted). To support his claim that the evidence had probative value, Mr. Sussman invited the court's attention to *Redmond v. Kingston*, 240 F.3d 590 (7th Cir. 2001). In *Redmond*, the Wisconsin courts had concluded that evidence of a prior false accusation was "inadmissible because the false charge did not have sufficient probative value to outweigh its inflammatory and prejudicial nature." R.5, Ex. D at 26. Mr. Sussman explained:

> The Seventh Circuit Court of Appeals ruled that the Wisconsin courts' decision to exclude the prior false sexual abuse accusation for failing the balancing test, when the complainant's credibility was the central issue, constituted an unreasonable limitation on Redmond's right to cross-examine a prosecution witness. *The court granted Redmond's habeas corpus petition because the limitation infringed on his sixth amendment right of confrontation.*

*Id.* (emphasis added).[14]

Mr. Sussman argued that the *Strickland* prejudice prong was satisfied with respect to both of counsel's deficiencies because "the missing [evidence] exposed Scott's willingness and motivation to lie about the ultimate fact" on which "the jury was being asked to pass judgment" and because the evidence "would [have] influence[d] the fact finder's assessment of the credibility of an important witness." *Id.* at 29-30. He argued that because Scott's credibility was crucial to the prosecution's case—the State lacked physical evidence or eyewitness testimony—"[t]here is a reasonable probability [that] had the missing [evidence] been presented the result would have been different." *Id.* at 31.[15]

---

[14] *See infra* pp. 60-63.

[15] Mr. Sussman's argument in his reply brief even more pointedly addresses how the violation of his rights under the Confrontation Clause establishes prejudice:

> [*State v.*] *Thiel*[, 665 N.W.2d 890 (Wis. 2003),] and *Redmond*, read together, conclusively establish Mr. Sussman's deficient performance claim. Because, as Mr. Sussman claims and the state does not dispute, if denial of a timely filed motion would have violated his sixth amendment right to confrontation (*Redmond*) and if defense counsel's failure to file a meritorious § 971.11(b)(2)(3) motion is deficient performance as a matter of law (*Thiel*)—then Mr. Sussman's deficient performance claim on this point absolutely satisfies the *Strickland* test.

R.5, Ex. F at 5.

For its part, the State maintained that Mr. Sussman's counsel had brought out "ample proof" that Scott had accused his father of sexual assault and that these accusations were false. R.5, Ex. E at 19. Furthermore, the State argued that, "had the motion been filed, it would have failed." *Id.* The State submitted that the trial court had not erred in its ruling on the postconviction motion that

> Sussman [had] failed to make a sufficient offer of proof that a reasonable person could infer that Scott in fact made a prior *untruthful* allegation of *sexual assault* against his father, as opposed to a truthful allegation that his father touched him on his intimate parts when he bathed him as a child in the shower. At the very least, it was reasonable for the trial court to limit the amount of evidence on this point . . . .

*Id.* at 22 (emphasis in original) (internal citation omitted).

The State also argued that defense counsel's failure to introduce the note from Bryce Mitchell was not deficient performance: "Whether or not [defense counsel] should have, or even could have, gotten the cryptic note written by Bryce Mitchell in November of 1999 into evidence . . ., [defense counsel]'s overall performance on this point remained competent." *Id.* at 13. Turning to prejudice, the State argued that the evidence only would have been cumulative "to that introduced by [defense counsel] which established almost conclusively that Scott was seeing therapists and teachers for the duration of his relation-

ship with Sussman but complained to no one about sexual abuse." *Id.* at 14-15.

The Court of Appeals of Wisconsin affirmed. On both alleged errors by trial defense counsel, the court by-passed the deficiency prong of the ineffective assistance of counsel claim and held that there was no prejudice. With respect to Mr. Sussman's claim of ineffective assistance of counsel based on the prior false allegation of sexual assault, the court stated

> that Sussman cannot show prejudice. In a well-explained and thorough decision denying the postconviction motion, the circuit court explained that it would not have granted a pre-trial motion to allow the evidence had it been brought. The court explained that the evidence did not meet the first and third elements of the three-part test outlined in *State v. DeSantis*. . . . Because the motion to allow the evidence could not have been successful for the reasons explained by the trial court, counsel's failure to bring the motion did not prejudice Sussman.

R.5, Ex. B at 4 (emphasis in original). With respect to Mr. Sussman's claim of ineffective assistance based on his attorney's failure to introduce Mitchell's note, the court stated:

> Although the note was not introduced as evidence, Sussman's attorney brought the contents of the note to the jury's attention through questioning when Sussman's attorney asked the victim at trial whether he had denied sexual contact with Sussman to his therapist. . . . Moreover, the note

would have been insignificant in impeaching the victim's credibility because other substantial evidence was introduced at trial in an attempt to impeach the victim's credibility. . . . We cannot conclude that the result of the proceeding would have been different had the note been introduced.

*Id.* at 2-3.

Mr. Sussman petitioned for review to the Supreme Court of Wisconsin. He contended that the state court of appeals had analyzed unreasonably the importance of counsel's deficiencies. With respect to the prior false-accusation evidence, Mr. Sussman argued that the appellate court's ruling was "an unreasonable application of Wisconsin law (*State v. DeSantis*, 155 Wis.2d 774, 456 N.W.2d 600 (1990)), an unreasonable application of the Supreme Court's confrontation doctrine, and an unreasonable determination of the facts to arrive at a decision contrary to established state and federal ineffective assistance of counsel and confrontation clause jurisprudence." R.5, Ex. G at 11. Mr. Sussman emphasized that Scott admitted to falsely accusing his father of "sexual assault" and "inappropriately touched him while taking a shower." *Id.* at 11-12 (internal quotation marks omitted). He analogized his case again to *Redmond* and also to *White v. Coplan*, 399 F.3d 18, 25 (1st Cir. 2005).[16] He believed that the evidence would have

---

[16] In *White v. Coplan*, 399 F.3d 18 (1st Cir. 2005), the petitioner, White, had been convicted of the sexual assault of two sisters. During his trial, White was prohibited from cross-examining

(continued...)

been probative of Scott's motive to falsely accuse his father figures when they withdrew from him. With respect to the therapist's note, he submitted that it was necessary because Scott had testified that he could not remember ever having made the denial to the therapist and because Cyr's testimony required corroboration. Mr. Sussman's brief concluded by suggesting that the court of appeals's "unfounded judgments result in a decision that is contrary to established state and federal ineffective assistance of counsel jurisprudence and also at odds with the Supreme Court's confrontation doctrine." *Id.* at 15.

The Wisconsin Supreme Court denied the petition for review.

**2.**

Having exhausted his remedies in the state courts, Mr. Sussman brought this habeas petition in the district court. He asserted that his trial counsel had been ineffective for the two reasons identified in the state-court proceedings. According to Mr. Sussman, the decision of the Court of Appeals of Wisconsin was an unreasonable

---

[16] (...continued)

the complaining witnesses concerning alleged prior false allegations of sexual assault because White had not established that the allegations were "demonstrably false," a requirement for admission under New Hampshire law. *Id.* at 22. On habeas review, the First Circuit determined that the state-court ruling infringed White's rights under the Confrontation Clause.

application of *Strickland*'s ineffective assistance of counsel principles because the court applied an overly strict prejudice standard and reached unreasonable factual conclusions. Mr. Sussman contended that the therapist's note was essential to impeach effectively Scott and to corroborate other witnesses' testimony about Scott's denial. Turning to the prior false-accusation evidence, Mr. Sussman argued that, based on *DeSantis*, *Redmond* and *White*, *see* R.12 at 16-17, this was important impeachment evidence because it showed Scott's "motive . . . to vent his anger and to get his father's attention," because the false accusation was repeated "during the same time period covered by the charging instrument," and because "the admitted lie and the accusations against Mr. Sussman similarly accused the only two father figures in Scott's life of inappropriately touching his genitals," R.1 at 16. Again, much of Mr. Sussman's legal argument focused on *Redmond*:

> The Seventh Circuit Court of Appeals ruled that the Wisconsin courts' decision to exclude the prior false sexual abuse accusation for failing the balancing test, when the complainant's credibility was the central issue, constituted an *unreasonable limitation on Redmond's right to cross-examine a prosecution witness*. The court granted Redmond's habeas corpus petition because the limitation infringed on his sixth amendment right of confrontation. *This case presents the same issue* in an ineffective assistance of counsel context.

R.12 at 16-17 (emphasis added).

A magistrate judge recommended denying relief, and the district court agreed. Addressing the prior false accusations, the district court held that it had "no authority to review the correctness of the appellate court's decision that the trial court had interpreted Wis. Stat. § 972.11(2) properly"; however, it did have authority to determine "whether the exclusion of the evidence of the prior allegation of sexual abuse prejudiced petitioner." R.19 at 4. The court concluded that Mr. Sussman had not been prejudiced because he was not "prevented entirely from bringing the victim's prior false accusation to the jury's attention. Counsel was allowed to question Scott's mother about the matter and to put in extensive evidence from other witnesses about Scott's propensity to lie." *Id.* at 5. Concerning the failure to offer Mitchell's note, the district court held that, contrary to Mr. Sussman's assertions, the state appellate court's conclusion that there was no reasonable probability of a different outcome was not an unreasonable one.

The district court nevertheless granted Mr. Sussman a certificate of appealability with respect to these ineffective assistance of counsel issues.

## II

## DISCUSSION

### A. Applicable Standards

A state prisoner's habeas claims are governed by the deferential standards set forth in the Antiterrorism

and Effective Death Penalty Act ("AEDPA"), 28 U.S.C.
§ 2254:

> Under AEDPA, when a state court actually has
> adjudicated a petitioner's claims on their merits,
> a federal habeas court may grant relief only
> when the state court's adjudication of the claim
> "(1) resulted in a decision that was contrary to,
> or involved an unreasonable application of,
> clearly established Federal law, as determined by
> the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an
> unreasonable determination of the facts in light
> of the evidence presented in the State court pro-
> ceeding." 28 U.S.C. § 2254(d).

*Williams v. Bartow*, 481 F.3d 492, 498 (7th Cir. 2007).

We evaluate the substance of Mr. Sussman's inef-
fective assistance of counsel claims according to the
familiar standard set forth in *Strickland v. Washington*,
466 U.S. 668 (1984).

> The law governing ineffective assistance claims,
> announced in *Strickland*, requires that [the defen-
> dant] must demonstrate that (1) counsel's perfor-
> mance fell "outside the wide range of profession-
> ally competent assistance" and (2) "there is a
> reasonable probability that, but for counsel's
> unprofessional errors, the result of the proceeding
> would have been different." *Strickland*, 466 U.S.
> at 690, 694.

*Allen v. Chandler*, 555 F.3d 596, 600 (7th Cir. 2009) (parallel
citations omitted). Because "[a]n ineffective-assistance

claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial," the *Strickland* standard "must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Harrington v. Richter*, 131 S. Ct. 770, 788 (2011) (quoting *Strickland*, 466 U.S. at 689-90). "To satisfy *Strickland*'s deficiency component, the convicted defendant must show that counsel's performance fell below an objective standard of reasonableness. This means identifying acts or omissions of counsel that could not be the result of professional judgment." *United States ex rel. Thomas v. O'Leary*, 856 F.2d 1011, 1015 (7th Cir. 1988) (internal citations omitted). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 131 S. Ct. at 788 (quoting *Strickland*, 466 U.S. at 690). Our review of counsel's performance is "highly deferential," and the defendant is required to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (internal quotation marks and citations omitted).

As the Supreme Court recently emphasized in *Harrington*, 131 S. Ct. at 788, when a habeas petitioner raises an ineffective assistance claim, "[t]he bar for establishing that a state court's application of the *Strickland* standard was 'unreasonable' is a high one, and only a clear error in applying *Strickland* will support a writ of habeas corpus." *Allen*, 555 F.3d at 600. "This principle applies

because 'Strickland builds in an element of deference to counsel's choices in conducting the litigation [and] § 2254(d)(1) adds a layer of respect for a state court's application of the legal standard.'" *Ouska v. Cahill-Masching*, 246 F.3d 1036, 1053 (7th Cir. 2001) (alteration in original) (quoting *Holman v. Gilmore*, 126 F.3d 876, 881 (7th Cir. 1997)). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

However, if a state court does not reach either the issue of performance or prejudice on the merits, then "federal review of this issue 'is not circumscribed by a state court conclusion,' and our review is de novo." *Toliver v. McCaughtry*, 539 F.3d 766, 775 (7th Cir. 2008) (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)).

## B. Deficient Performance

Mr. Sussman claims that his trial counsel's failures fell below an objective standard of reasonableness. As noted previously, the state appellate court did not address the merits of Mr. Sussman's allegations of deficient performance, but proceeded directly to the prejudice inquiry.[17] Consequently, we review de novo Mr. Sussman's claim of deficient performance. *See Toliver*, 539 F.3d at 775.

---

[17] The operative decision for purposes of AEDPA is "that of the last state court to address the claim on the merits." *Garth v. Davis*, 470 F.3d 702, 710 (7th Cir. 2006).

Mr. Sussman argues that his counsel's failure to bring a pretrial motion concerning the prior false allegations of sexual assault and to introduce Mitchell's note were not the result of a reasoned approach to trial. Instead, counsel stated that he simply forgot that Wisconsin law requires that there be a pretrial determination of the admissibility of prior false allegations of sexual abuse. Additionally, Mr. Sussman's counsel testified that his failure to introduce Mitchell's note was the result of confusion over the trial court's evidentiary ruling. Because these actions cannot be considered a part of any sound trial strategy, Mr. Sussman maintains, his counsel's performance was constitutionally ineffective.

The State does not argue that counsel's actions reflect a sound trial strategy. Instead, it merely reiterates that counsel's actions are entitled to a presumption that they were made in the exercise of reasonable professional judgment. This statement is true as a general proposition of law; nevertheless, it has little bearing on this case. The testimony of Mr. Sussman's counsel at the hearing on the postconviction motion establishes that his counsel's actions were the result of oversight and confusion.

The State further emphasizes that Mr. Sussman is not "constitutionally entitled to error-free representation." Respondent's Br. 18. We agree. We often have stated that "[i]t is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amend-

ment speaks." *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009). Nevertheless, we must keep in mind that the Supreme Court "has allowed for the possibility that a single error may suffice 'if that error is sufficiently egregious and prejudicial.'" *Id.* (quoting *Murray v. Carrier*, 477 U.S. 478, 496 (1986)). Consideration of this issue necessarily overlaps with our consideration of the prejudice prong of the *Strickland* analysis, and, therefore, we now turn to the question of whether Mr. Sussman was prejudiced by counsel's errors.

## C. Prejudice

### 1. False Allegation Claims

#### a. Application of AEDPA Deference

Turning first to the prior false allegations of sexual assault, Mr. Sussman takes the view that we should not apply the deferential standard set forth in 28 U.S.C. § 2254(d) because the state court did not resolve on the merits the question of whether Mr. Sussman was prejudiced by his counsel's actions. Mr. Sussman's own submission, however, belies his assertion. He states in his brief that, "[a]s to the false accusation, the state court held Sussman did not meet the prejudice test because no prejudice could accrue from defense counsel's failure to file a pre-trial motion that would have been denied." Petitioner's Br. 16. At bottom, Mr. Sussman's argument is not that the state court failed to resolve the issue of prejudice, but that, because the state appellate court incorrectly concluded that the motion would have been unsuccessful,

the court never weighed the potential impact of the omitted evidence on the jury. Resolving a claim on an improper or faulty basis is not the same as failing to adjudicate the claim on the merits. *See Malinowski v. Smith*, 509 F.3d 328, 332-34 (7th Cir. 2007). Here, there is no question that, as Mr. Sussman tacitly acknowledges, the state court held that Mr. Sussman had not been prejudiced by his counsel's error. Therefore, we must evaluate this determination of the state appellate court under the deferential AEDPA standard. *See Harrington*, 131 S. Ct. at 787-88.

### b.  Reviewability of Claims

The state appellate court determined that Mr. Sussman was not prejudiced by his counsel's failure because, based on its balancing of the *DeSantis* factors,[18] it would have sustained the denial of a timely motion to introduce the prior false allegations of sexual assault. Mr. Sussman maintains that the state court both misunderstood the nature of the prior false accusations as well as underestimated their probative value.

*DeSantis* makes it clear that Wisconsin's rape shield law is an effort by the Wisconsin legislature to balance the need to protect complainants' dignity with the "defendant's constitutional rights to a fair opportunity to defend and to a jury trial." 456 N.W.2d at 607. Indeed, considerations critical to a Wisconsin state court's deter-

---

[18] *See supra* note 13 and accompanying text.

mination of admissibility under Wisconsin Statutes sections 972.11(2)(b)3 and 971.31(11) are also important to a federal court's Confrontation Clause analysis. *See infra* pp. 54-60. To the extent that the state court weighed the factors embodied in the state statute, it engaged in a purely state-based process mandated by its legislature. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Consequently, we cannot engage in the "reweighing" of the *DeSantis* factors urged by Mr. Sussman.

However, as Mr. Sussman argues and as *DeSantis* requires, the state court also must take into consideration the principles animating the federal Confrontation Clause in its final determination whether to admit evidence.[19]

---

[19] Despite the State's claim to the contrary, *see* Respondent's Br. 44 n.4, Mr. Sussman had brought to the trial court's attention the possible confrontation clause issues attendant to excluding relevant testimony. *See* St. R.180 at 1-2 ("the accused's right to confrontation and to present evidence overrides the procedural requirement for a pretrial determination of the admissibility of the evidence [under the Wisconsin statute]"); *id.* at 7-8 (quoting *State v. Pulizzano*, 456 N.W.2d 325 (Wis. 1990), and *Davis v. Alaska*, 415 U.S. 308 (1974), for the proposition that "the State's interest in protecting a witness 'cannot require yielding of so vital a constitutional right as the effective

(continued...)

According to Mr. Sussman, the state court's ruling independently violated his rights to confront witnesses against him. When placed within the overarching context of his ineffective assistance claim, therefore, Mr. Sussman maintains that he did suffer prejudice as a result of his counsel's failures because, although not

---

[19] (...continued)

cross-examination of an adverse witness' "); *cf.* Tr. 1023 (prosecuting attorney stating that Mr. Sussman's counsel is "attempt[ing] to now argue that he can evade that law claiming that his constitutional right trumps the procedural requirements of the statute"). Mr. Sussman also addressed the interplay of the Confrontation Clause with his ineffective assistance of counsel claims in his brief to the state appellate court. He did so both by showing that the trial court had failed to balance properly the *DeSantis* factors and also by bringing to the appellate court's attention federal case law that speaks to a defendant's rights under the Confrontation Clause. *See* R.5, Ex. D at 23-29.

Moreover, after being denied relief by the state appellate court, Mr. Sussman urged the state supreme court to review his ineffective assistance claim related to the false accusations for the following reasons:

The issue should be reviewed because the reviewing court[']s decision is based on a misunderstanding of the standard of review and an unreasonable application of the facts to the law. Its unfounded judgments result in a decision that is contrary to established state and federal ineffective assistance of counsel jurisprudence and also at odds with the Supreme Court's confrontation doctrine.

R.5, Ex. G at 15.

meritorious on state evidentiary grounds, the motion ultimately would have been granted because of the importance of the federal rights involved. As we shall explain in greater detail in the paragraphs that follow, this inquiry is a proper subject for habeas review.

### c. Federal Claims

"Regardless of how a state court applies state evidence rules, a federal habeas court has an independent duty to determine whether that application violates the Constitution." *Jones v. Cain*, 600 F.3d 527, 536 (5th Cir. 2010). Mr. Sussman relies heavily on our decision in *Redmond*, to support his claim that the state court's evidentiary rulings adversely impacted his rights under the Confrontation Clause. In *Redmond*, we considered whether the defendant's rights under the Confrontation Clause were implicated by the Wisconsin state court's exclusion of evidence related to prior false allegations of sexual assault.[20] We found it unnecessary in *Redmond* to elaborate in great detail on the nature of those rights. However, as our references in *Redmond* suggest, *Davis v. Alaska*, 415 U.S. 308 (1974), provides an appropriate starting point for such a discussion.

---

[20] Notably, we read *DeSantis* as acknowledging—explicitly—that the balancing test that it implemented must be applied in a manner that gives full recognition to the important values protected by the Confrontation Clause of the federal Constitution.

**(1)**

In *Davis*, the Court reiterated that "[c]onfrontation means more than being allowed to confront the witness physically. 'Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination.'" *Davis*, 415 U.S. at 315 (alteration in original) (quoting *Douglas v. Alabama*, 380 U.S. 415, 418 (1965)). The Court observed that "[c]ross-examination is the principal means by which the believ-ability of a witness and the truth of his testimony are tested." *Id.* at 316. The Court noted that a witness's credi-bility could be called into question in two ways. First, the defendant could launch a "general attack on the credibility of the witness," for instance, by "introduc[ing] evidence of a prior criminal conviction of that witness." *Id.* "By so doing," the Court explained, "the cross-examiner intends to afford the jury a basis to infer that the witness' character is such that he would be less likely than the average trustworthy citizen to be truthful in his testi-mony." *Id.* The Court contrasted a "general attack" with

> [a] more particular attack on the witness' credibil-ity [] effected by means of cross-examination directed toward revealing possible biases, preju-dices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand. The partiality of a witness is subject to exploration at trial, and is *always rele-vant as discrediting* the witness and affecting the weight of his testimony." 3A J. Wigmore, Evidence § 940, p. 775 (Chadbourn rev. 1970). We have

recognized that *the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. Greene v. McElroy,* 360 U.S. 474, 496 (1959).

*Id.* at 316-17 (emphasis added) (parallel citations omitted). Thus, exposing a witness's reasons for fabrication in a specific case is at the heart of the Confrontation Clause.

Despite this weighty interest, a defendant's right to cross-examine is not unlimited. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall,* 475 U.S. 673, 679 (1986). "In a criminal case, restrictions on the defendant's rights 'to confront adverse witnesses and to present evidence may not be arbitrary or disproportionate to the purposes they are designed to serve.'" *White,* 399 F.3d at 24 (quoting *Michigan v. Lucas,* 500 U.S. 145, 151 (1991) (internal quotation marks omitted)).

> Such language, clear although general, calls for a balancing of interests depending on the circumstances of the case. Factors that the Supreme Court has deemed relevant are the importance of the evidence to an effective defense, *Davis*[, 415 U.S. at 319]; the scope of the ban involved, *Van Arsdall,* 475 U.S. at 679; and the strength *vel non* of state interests weighing against admission of

the evidence. *See Chambers v. Mississippi*, 410 U.S. 284, 295 (1973).

*White*, 399 F.3d at 24 (parallel citations omitted). Thus, we have upheld a court's limitation of cross-examination when "the questions were designed not to elicit information regarding the witnesses' possible bias, but rather to mine for further details concerning [a witness], whose importance to the case already had been deemed minimal." *United States v. Valles*, 41 F.3d 355, 359 (7th Cir. 1994). Similarly, we determined that there had been no Confrontation Clause violation when a court limited cross-examination that "possibly could have impacted on [the witness's] general credibility but would not have exposed a bias in favor of the government." *United States v. Saunders*, 166 F.3d 907, 919 (7th Cir. 1999). More closely related to the present situation, we have upheld a court's decision not to allow cross-examination of a child witness about prior, allegedly false, accusations of sexual assault when the state trial court explicitly found that the complainant "was not clever enough to concoct false allegations of sexual abuse." *Cookson v. Schwartz*, 556 F.3d 647, 655 (7th Cir. 2009). That is, on habeas review, we would not disturb a state trial court's factual finding that a witness was incapable of giving effect to the type of motivation that the defense wished to expose.

By contrast, a trial court's limitation on cross-examination aimed at exposing a witness's motive or bias reaches the core of Confrontation Clause concerns. To justify limiting a defendant's right to confront his accusers on

issues of motive and bias, the countervailing policy interest must be concrete and articulable, not based on surmise or speculation. *See Olden v. Kentucky*, 488 U.S. 227, 232 (1988).[21]

---

[21] In *Olden v. Kentucky*, 488 U.S. 227 (1988), the petitioner and co-defendant, Harris, had been convicted of rape. The complainant, Matthews, alleged that, after the incident, the defendant had dropped her in the vicinity of the house of a friend, Russell. As it turns out, Matthews—a Caucasian—was in a relationship with Russell—an African American; indeed, by the time of trial, they were living together. The defendants claimed that the encounter had been consensual. Their "theory of the case was that Matthews concocted the rape story to protect her relationship with Russell, who would have grown suspicious upon seeing her disembark from [the defendant's] car." *Id.* at 230. The trial court granted the prosecutor's motion in limine to "keep all evidence of . . . [the] living arrangement from the jury." *Id.* The state appellate court upheld the ruling on the grounds that "[f]or the trial court to have admitted into evidence testimony that Matthews and Russell were living together at the time of the trial may have created extreme prejudice against Matthews," *id.* at 231 (quotation marks omitted), because jurors otherwise would have looked askance at the witness's interracial relationship. The Supreme Court held that the state appellate court "failed to accord proper weight to petitioner's Sixth Amendment right to be confronted with the witnesses against him." *Id.* (internal quotation marks omitted). Specifically, it reasoned:

> While a trial court may, of course, impose reasonable limits on defense counsel's inquiry into the potential bias of a prosecution witness, to take account of such factors as "harassment, prejudice, confusion of the

(continued...)

Furthermore, a defendant has the right to explore fully each potential motive or source of bias. In *United States v. Martin*, 618 F.3d 705, 728 (7th Cir. 2010), for example, the defendant alleged that his Confrontation Clause rights had been violated when he was not permitted to cross-examine a witness concerning any link "between [the witness's] involvement in [a] pending state murder investigation and his testimony in the federal action." We agreed that "[t]he timing, nature and status of the [state] murder investigation was probative of bias[,] and the defense had the right to explore it fully and allow the jury to draw its own conclusions." *Id.* at 730. Additionally, we determined that the fact

> [t]hat the defendants were permitted to examine other matters relating to [the witness's] alleged bias, such as the written plea agreement and [the witness's] prior convictions, does not resolve the Sixth Amendment violation. The alleged bias arising out of the [state] murder investigation was a separate and independent area of bias,

---

[21] (...continued)

> issues, the witness' safety, or interrogation that [would be] repetitive or only marginally relevant," *Delaware v. Van Arsdall*, [475 U.S. at 679], the limitation here was beyond reason. Speculation as to the effect of jurors' racial biases cannot justify exclusion of cross-examination with such strong potential to demonstrate the falsity of Matthews' testimony.

*Id.* at 232 (initial alteration in original) (parallel citations omitted).

which the defendants sufficiently had distin-
guished from the other areas of bias.

*Id.* (internal citations omitted).[22]

## (2)

With this background in mind, we return to our evalua-
tion of the Confrontation Clause claims set forth in
*Redmond*. In that case, the petitioner, Redmond, had
been a counselor at an institution for minors suffering
from drug and alcohol addiction. He was convicted of
statutory rape of a fifteen-year-old resident, Heather; it
was alleged that he had given her cocaine in return for
sexual favors. At trial, the principal evidence was the
testimony of Heather and of another resident, who
"merely repeated what Heather had told her had hap-
pened." *Redmond*, 240 F.3d at 591. The evidence that the
defense wished to introduce was based on the following
facts:

> Eleven months before the alleged offense,
> Heather had told her mother that she had been
> forcibly raped, and she had offered her torn
> clothes as evidence. She had repeated the story of
> the rape, with many circumstantial details, to
> a hospital nurse and to a police officer investi-

---

[22] Although we determined in *United States v. Martin*, 618
F.3d 705, 730 (7th Cir. 2010), that a Confrontation Clause
violation had occurred, we determined that the error was
harmless.

gating the incident, but later had admitted making up the story (and ripping her clothes herself) in order to get her mother's attention. Her new story was that she had had sex with the man she had accused of forcible rape, but that it had been with her consent. Since she was underage, the police continued to investigate the incident as a crime. The man was never found, and there is no evidence other than Heather's say-so that the incident actually occurred. There is no serious doubt that her recantation of the forcible-rape story was truthful. Redmond offered more than thirty police reports of the investigation of Heather's claim that she had been forcibly raped, convincingly demonstrating its falsity, and in addition the district attorney had instituted contempt charges against Heather.

*Id.* The state court had held that the evidence was inadmissible because, under section 972.11(2)(b)3, "Heather's false charge did not have 'sufficient probative value to outweigh its inflammatory and prejudicial nature.' " *Id.* We, however, determined that Redmond had made out a prima facie case of a constitutional violation for several reasons. First, the state court had treated the prior false allegation of sexual assault as a general attack on Heather's credibility. This was incorrect; we explained:

With all due respect, we believe that the court of appeals' analysis and conclusion cannot be considered a reasonable application of the Supreme Court's confrontation doctrine. The evidence of

the false charge of forcible rape was not cumulative of other evidence bearing on Heather's credibility, because none of the other evidence either involved a false charge of being sexually assaulted or furnished a motive for such a charge. The fact that a teenage girl has a disordered past and lies a lot (who doesn't?) does not predict that she will make up stories about having sex. To indulge such an assumption would be to place such persons largely beyond the protection of the law. But the fact that the girl had led her mother, a nurse[] and the police on a wild goose chase for a rapist merely to get her mother's attention supplied a powerful reason for disbelieving her testimony eleven months later about having sex with another man, by showing that she had a motive for what would otherwise be an unusual fabrication.

The evidence thus was not cumulative, or otherwise peripheral, considering that testimony by Heather was virtually the only evidence of Redmond's guilt that the prosecution had. Nor was the evidence of her previous false charge of rape prejudicial to the state . . . .

*Id.* at 591-92 (internal citations omitted). Additionally, we believed that the state court had given excessive weight to the possibility of jury confusion:

[I]n concluding that there was a danger of confusion[,] the court committed a fatal analytical mistake. It assumed that Heather would be required or permitted to testify that she had had

consensual sex with the alleged rapist, evidence barred by the rape-shield law. The only evidence that was relevant to her credibility in Redmond's case, however, the only evidence she would or should have been permitted to give on that subject, was that within the preceding year she had made up a story about being forcibly raped. Whether or not she had had sex with the alleged rapist was irrelevant, since Redmond was not prepared to try to prove that she had not. For unexplained reasons the Wisconsin court of appeals thought that if Redmond's lawyer had been permitted to ask Heather whether she had ever made a false charge of forcible sexual assault, the door would have been opened to an inquiry into whether she had had sex on that occasion at all. We cannot think of any reason why.

*Id.* at 592.

### (3)

We have the same concerns here as we did in *Redmond*. In seeking to examine Scott on the false allegations against his father, Mr. Sussman's counsel was not attempting simply to expose another incident of Scott's lack of truthfulness; instead, he was attempting to "reveal[] possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." *Davis*, 415 U.S. at 316. The offer of proof established that Scott made false al-

legations of sexual abuse against his father at a time when he had no contact with his father and in an attempt to get his father's attention. *See* St. R.151 at 18, 22. Similarly, Scott's allegations against Mr. Sussman came shortly after Scott moved back to Indiana and was seeing less of Mr. Sussman. The jury reasonably could have concluded that Scott was prone to use allegations of sexual abuse against father figures as a means either of gaining their attention or as a means of punishing them for abandoning him. *See Redmond*, 240 F.3d at 591-92 ("[T]he fact that the girl had led her mother, a nurse[] and the police on a wild goose chase for a rapist merely to get her mother's attention supplied a powerful reason for disbelieving her testimony eleven months later about having sex with another man, by showing that she had a motive for what would otherwise be an unusual fabrication."). In short, "[w]e are dealing here with something far more potent than 'general credibility' evidence which, under confrontation clause standards, may have a lower status." *White*, 399 F.3d at 26. We are addressing evidence that exposes a motive to fabricate a specific kind of lie under a specific set of circumstances and, therefore, directly implicates Mr. Sussman's rights under the Confrontation Clause.

Furthermore, the State's interest in limiting the testimony appears exaggerated. As explained by the Supreme Court of Wisconsin in *DeSantis*, the State's rape shield law was designed "to respond to claims that rules of evidence served to humiliate and degrade complainants by allowing the defendant to put the com-

plainant on trial and served to deter complainants from pressing charges." 456 N.W.2d at 607. However, these worthy concerns cannot be the only factors for judicial consideration when there is a false allegation of sexual assault.

The State maintains that the trial court's refusal to admit evidence of false allegations also was justified because the evidence could have confused the jury. The State maintains that there was insufficient evidence that Scott's allegations were false. It argues that it is important that Scott did not take the initiative in making allegations against his father, but merely responded to questions about inappropriate touching by child protective services. Scott, the State claims, never accused his father of any actual wrongdoing. Consequently, the State believes that, had Mr. Sussman been allowed to question Scott about his false allegations, the jury's attention would have been diverted to a peripheral matter.

We believe the State's attempt to trivialize the importance of Scott's allegations against his father evinces a fundamental misunderstanding of the importance of the guarantees of the Confrontation Clause in the truth-finding process of a criminal trial. In any event, the State's argument overlooks the fact that Scott did not make the false allegation only once to the representative from child protective services. Scott repeated the allegation to his therapist on two occasions *after* child protective services had determined that the allegations were unsubstantiated. *See* St. R.206, Ex. 2 at 25; *id.*, Ex. 4.

The State also insists that, if the evidence concerning the prior false accusations had been admitted, the focus of the trial would have shifted to the interaction between Scott and his father as opposed to the interaction between Scott and Mr. Sussman. As in *Redmond*, we believe that these fears largely are unfounded. It is Scott's motive in bringing and repeating the allegations against his father that makes those allegations relevant, not the specific underlying actions that prompted the allegations. Allowing Mr. Sussman to probe Scott's motive would not necessitate lengthy discussion of what actually had occurred between Scott and his father.

Based on our analysis in *Redmond*[23] and the cases on which *Redmond* relies—*Davis*, *Van Arsdall* and *Olden*—we believe that, if Mr. Sussman's counsel had filed a timely pretrial motion with respect to the accusations, and, furthermore, if the court had prohibited Mr. Sussman from introducing that evidence, the state court's ruling would have run afoul of Mr. Sussman's rights under the Confrontation Clause. Therefore, we must conclude that, by construing the task of evaluating the admissibility of Scott's accusation against his father without any reference, much less a plenary reference, to the

---

[23] The State makes no effort to distinguish *Redmond*; instead, it relies on the magistrate judge's conclusion that there are "profound factual differences" between *Redmond* and Mr. Sussman's case. Respondent's Br. 45, n.2 (quotation marks and citation omitted). The State, however, never explains what those differences are or whether they are important to our analysis.

principles of the Confrontation Clause, the state courts applied unreasonably the applicable federal constitutional guarantees as construed by the Supreme Court of the United States.[24]

Nevertheless, even if the state court committed this error, we still are faced with the question, for purposes of ineffective assistance of counsel, whether counsel's failure to introduce this evidence prejudiced Mr. Sussman. In assessing whether there is a reasonable probability that the result of the proceeding would have been different, we "must consider the evidence in its totality." *Wright v. Gramley*, 125 F.3d 1038, 1042 (7th Cir. 1997). "Whether such a reasonable probability exists depends, of course, on the nature and strength of the government's case against" the defendant, and "the nature of his attorney's failures." *United States v. Morrison*, 946 F.2d 484, 500 (7th Cir. 1991); *see also Wright*, 125 F.3d at 1042 (stating that a verdict supported weakly by the record "is more likely to have been affected by errors

---

[24] The present case, therefore, stands in contrast to *Dunlap v. Hepp*, 436 F.3d 739 (7th Cir. 2006). In *Dunlap,* we denied habeas relief to the petitioner, who had been convicted of child sexual assault, because we concluded that the Supreme Court of Wisconsin had not unreasonably applied "established law as set out by the U.S. Supreme Court in *Chambers* or *Davis*." *Id.* at 745. "A highly significant factor" in our determination was that "the Wisconsin court recognized that its rape shield law must yield if it would deprive a defendant of his constitutional rights." *Id.* As noted above, this recognition was absent from the Wisconsin courts' consideration of Mr. Sussman's case.

than one with overwhelming record support" (quotation marks and citations omitted)).

The State urges that, even if this evidence had been admitted, it would have been cumulative to Scott's admission on cross-examination that he had accused his father of sexual assault. However, there is an obvious difference between an accusation and a *false* accusation. Mr. Sussman never was allowed to establish that Scott's prior accusation was, in fact, false; nor was he allowed to explore Scott's motives for falsely accusing his father and to draw parallels between Scott's allegations against his father and Scott's allegations against Mr. Sussman.

Additionally, the State maintains that, even if Mr. Sussman was prohibited from introducing false-accusation evidence, he

> was still able to present to the jury all of the following evidence: Scott's admission that he accused his father of sexual assault, Scott's threat to report his uncle for abuse, Scott's false accusation that Sussman sexually assaulted other boys he was mentoring, Suzette Cyr's testimony that Scott admitted in 2004 he was not sexually assaulted by Sussman, and Scott's (and his mother's) overall reputation for untruthfulness. This all supported the argument that Scott falsely accused his father of sexual assault when he was a small child and was now falsely accusing Sussman of the same.

Respondent's Br. 45. The State, we believe, overestimates the value of some of this evidence. For instance, when Mr. Sussman's counsel attempted to explore the fact that Scott had repeated the allegations against his father to Bryce Mitchell, the court sustained the State attorney's objection and later instructed the jury: "You are to disregard and strike from the record any reference that was made with respect to a false claim of sexual assault repeated to a Bryce Mitchell." Tr. 374.[25]

We agree that this evidence is probative of Scott's truthfulness and, indeed, that Mr. Sussman's counsel was successful in generally discrediting Scott as a witness. However, this evidence does not take the place of the false-accusation evidence that Mr. Sussman sought to introduce. None of the above evidence demonstrates that Scott lies specifically about sexual abuse when he feels abandoned by father figures. *See Redmond*, 240 F.3d at 593 (distinguishing evidence of motive from general attacks on credibility).

Also of significant importance to our conclusion is the centrality of Scott's testimony to the State's case. *See Olden*, 488 U.S. at 233 (considering strength of State's case in evaluating whether Confrontation Clause violation was harmless). Scott's testimony was the only evidence that Mr. Sussman committed the heinous acts of which he was accused. Even without the false-accusation testimony, the jury acquitted Mr. Sussman on the

---

[25] Similarly, as will be discussed *infra* at page 72, the State went to great lengths to discredit the testimony of Cyr.

charges related to exhibiting dangerous materials; it appears, therefore, that the jury harbored doubts as to some aspects of Scott's testimony. *See id.* (noting that the jury's verdict could not be "squared with the State's theory of the alleged crime"). We believe that this crucial evidence, which would have given the jury a motive for Scott's allegations against Mr. Sussman, very well may have tipped the balance in favor of Mr. Sussman.

## 2.  Bryce Mitchell's Note

### a.

Mr. Sussman also claims that he suffered prejudice as a result of his attorney's failure to offer into evidence Mitchell's note. Mr. Sussman first argues that we should not defer to the state court's determination on the issue of prejudice because it applied the incorrect substantive standard. Mr. Sussman maintains that he was required only to establish a "reasonable probability" that, but for counsel's errors, the result would have been different, *Strickland*, 466 U.S. at 694. The state appellate court, however, required him to meet a higher standard and to establish that the actual "result of the proceeding would have been different." R.5, Ex. B at 3.

Mr. Sussman correctly cites the *Strickland* standard and correctly notes that the state appellate court omitted the "reasonable probability" language from its concluding sentence. However, we do not believe that the omission of this language renders the decision "contrary to" *Strickland*. The state appellate court previously had

cited *State v. Johnson*, 449 N.W.2d 845 (Wis. 1990), as providing the operative ineffective assistance standard, and *Johnson* incorporates the ineffective assistance standard set forth in *Strickland*. *See Johnson*, 449 N.W.2d at 847-48. Furthermore, it is clear from the court's analysis that it did not believe that the note had a reasonable probability of altering the jury's verdict. The court perceived that the "therapist's note would have added little to the information received by the jury" and that "the note would have been insignificant in impeaching the victim's credibility." R.5, Ex. B at 3. Consequently, we do not believe the court's use of a "short-hand" recitation of the *Strickland* test suggests that it employed the incorrect standard. *See Woods v. Schwartz*, 589 F.3d 368, 378 n.3 (7th Cir. 2009). We therefore evaluate the state appellate court decision under the deferential standard set forth in AEDPA.

**b.**

The state appellate court concluded that Mitchell's note

> would have been insignificant in impeaching the victim's credibility because other substantial evidence was introduced at trial in an attempt to impeach the victim's credibility. For example, Sussman's counsel elicited testimony from the victim's mother's friend that the victim had said the victim was lying about the sexual contact with Sussman.

R.5, Ex. B at 3. With all due respect, we cannot conclude that Mitchell's note would have been merely cumulative

of Cyr's testimony. Cyr did testify that Scott had stated that his allegations against Mr. Sussman were untrue; however, Cyr was thoroughly discredited by the State. The State established that Cyr had become angry with McDonald because McDonald allegedly had refused to pay on a loan from Cyr. As a result, Cyr threatened McDonald with legal action; more importantly, she also threatened McDonald that, if McDonald did not pay, Cyr "would come forward and tell what had happened that day with Scotty, what he had said." Tr. 1870. By contrast, Mitchell was an objective third party, whom Scott had grown to trust with the most personal aspects of his life. Unlike Cyr, Mitchell had no motive at all to record falsely what Scott had told her. We believe that the jury would have given far more credence to Mitchell's note than it did to Cyr's testimony.

Moreover, in assessing the prejudice resulting from counsel's failure, we must consider the overall strength or weakness of the State's case against Mr. Sussman. As we have discussed previously, there were no witnesses to, and no physical evidence substantiating, the assaults. The State's case rose or fell on the testimony of Scott. Given that the jury acquitted Mr. Sussman on the harmful-material charges, there were aspects of Scott's testimony that the jury members must have doubted. It is difficult to say that Mitchell's note would not have had an impact on the jury's deliberations.

Despite our estimation of the impact of this error, our obligation to defer to "reasonable" state-court determinations may well have required us to refrain from

granting the writ. In order to grant relief based on this error alone, we would have to conclude that the appellate court's contrary determination was "unreasonable," i.e., "lying well outside the boundaries of permissible differences of opinion." *Hardaway v. Young*, 302 F.3d 757, 762 (7th Cir. 2002). Here, however, we are not faced with a single error by counsel and, therefore, must consider the cumulative impact of this error when combined with counsel's failure to secure a pretrial ruling on the evidence related to the prior false accusations of sexual abuse. *See Goodman v. Bertrand*, 467 F.3d 1022, 1030 (7th Cir. 2006) (stating that "we must assess the totality of the omitted evidence under *Strickland* rather than the individual errors" (internal quotation marks and citation omitted)). If the jury had considered the false-accusation evidence in conjunction with Mitchell's note, there is more than a reasonable probability that the result would have been different. Indeed, we do not believe that the state court, had it considered the force of the evidence, reasonably could have reached a different result.

### Conclusion

In sum, we believe that the state appellate court unreasonably concluded that Mr. Sussman had not been prejudiced by his counsel's errors. Unlike the Supreme Court of Wisconsin in *DeSantis* and unlike this court in *Redmond*, its approach to the admission of the evidence failed to consider the possible impact on the defendant's rights under the Confrontation Clause. We therefore

reverse the judgment of the district court and remand the case with instructions to grant the writ with respect to Mr. Sussman's child sexual assault convictions unless the State elects to retry Mr. Sussman.

REVERSED and REMANDED
with INSTRUCTIONS