In the

# United States Court of Appeals

### For the Seventh Circuit

No. 05-2179

CHARLES A. DUNLAP,

*Petitioner-Appellant,*

*v.*

RANDY HEPP,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 03-C-161—**William E. Callahan, Jr.**, *Magistrate Judge.*

ARGUED NOVEMBER 8, 2005—DECIDED FEBRUARY 1, 2006

Before BAUER, MANION, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Before us is Charles Dunlap's appeal from the denial of his petition for a writ of habeas corpus. The district court granted a certificate of appealability on a single issue: whether Dunlap was deprived of his Sixth Amendment right to confront witnesses and present a defense by the state trial court's application of the Wisconsin rape shield law. Wis. Stat. § 972.11(2) (1997-98).

On November 7, 1989, Dunlap babysat then 6-year-old Jamie F. Afterwards, Jamie told her mother that Dunlap had "touched her private parts." Jamie thought her mother did not believe her, and a few days later she told her father.

He reported the incident to the police, who obtained a warrant for Dunlap's arrest. But Dunlap had left Wisconsin. He was not arrested until 8 years later when he was found in California.

When Dunlap's trial finally began, Jamie was 15 years old. She testified that when she was 6, she was left in Dunlap's care at the home of her mother's friends, Susan Smith and Gary Cox, with whom Dunlap had been staying. Jamie testified that when she was in bed, Dunlap entered the room and got in the bed beside her. She said he put his hands inside her underwear and fondled her buttocks and vagina.

Cross-examination revealed several inconsistencies in Jamie's testimony. When she was interviewed in 1989 she said that Cox's son Shawn was also in the house at the time of the incident, but at trial she said she was alone with Dunlap. In 1989 she did not say that Dunlap penetrated her vagina with his finger, but at the preliminary hearing, 8 years later, she said he had. Also in 1989 Jamie had not mentioned that Dunlap had threatened her. At trial, she said he threatened to kill her parents if she told anyone what happened.

In an effort to rehabilitate Jamie, the State called Theresa Hanson, a child protective services investigator for Walworth County, Wisconsin. Hanson had interviewed Jamie and prepared a report in 1989. She testified about typical reporting behaviors of child sexual assault victims. She said that 6-year-old children often do not grasp the concepts of "in" and "out" in regard to something being put into their genitalia. She said 6-year-olds are often confused about the details of an incident. They also have trouble with the concepts "before" and "after." She also said that fear, guilt, and embarrassment could have explained the inconsistencies in Jamie's testimony and her delay in reporting certain aspects of the assault. In addition, Hanson

testified that during the 1989 interview, Jamie fidgeted, kicked the table, put her hands in her mouth, and was generally reticent about discussing the incident. This behavior, Hanson said, is consistent with that of a sexual assault victim.

During cross-examination, Hepp's counsel attempted to question Hanson about Jamie's "detailed and unexplained sexual knowledge." Counsel made an offer of proof, pointing out that Hanson's 1989 report included a statement from Ms. Smith. In that statement, Smith, who was deceased when the case was tried, had revealed concern about Jamie, who, in Smith's view, was involved in a great deal of "seductive behavior," including touching men in the genital area, "humping the family dog," and frequent masturbation. Smith noted that these behaviors occurred before the alleged assault by Dunlap.

The State objected to this evidence, saying it was barred both by the rule against hearsay and the state rape shield law. The court agreed and excluded the evidence. Dunlap was convicted of first-degree sexual assault of a child in violation of Wis. Stat. § 972.11(2). On direct appeal, he challenged the exclusion of the evidence. The Wisconsin Court of Appeals reversed Dunlap's conviction. *State v. Dunlap*, 620 N.W.2d 398 (2000). But the Supreme Court reinstated it. *State v. Dunlap*, 640 N.W.2d 112 (2002). After exhausting his state remedies, Dunlap filed a federal petition for a writ of habeas corpus, which the district court denied. This appeal followed.

A petition for a writ of habeas corpus on behalf of a person in state custody can be granted only if the state court proceeding resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1). A decision is "contrary to" established federal law as determined by the

Supreme Court if "the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a result opposite" to that reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court decision is an unreasonable application of Supreme Court precedent when the court "correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular prisoner's case . . . ." *Williams*, at 407-08. Dunlap's petition falls under the "unreasonable application" prong of § 2254(d)(1). In order for us to grant relief under this provision, the decision of the Wisconsin Supreme Court must be unreasonable—not simply erroneous and incorrect. *Williams*, at 411. On appeal from the district court's denial of a writ of habeas corpus, we review findings of fact for clear error and legal conclusions *de novo*. *Rittenhouse v. Battles*, 263 F.3d 689 (7th Cir. 2001).

The Sixth Amendment to the United States Constitution guarantees the right of an accused in a criminal prosecution to be confronted by the witnesses against him. The purpose of the Confrontation Clause is to "secure for the opponent the opportunity of cross-examination." *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). Nevertheless, trial judges retain "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on . . . cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986).

In this case, the parties agree that the governing Supreme Court precedent is found in *Chambers v. Mississippi*, 410 U.S. 284 (1973), and *Davis v. Alaska*, 415 U.S. 308

(1974).[1] While the Wisconsin Supreme Court did not specifically mention these cases in its *Dunlap* decision, the case the court relied on, *State v. Pulizzano*, 155 Wis. 2d 633, 456 N.W.2d 325 (1990), rests on *Chambers* and *Davis* and recognizes clearly that "consistent with *Chambers* and *Davis* in some cases a defendant's confrontation and compulsory process rights might require that evidence of a complainant's prior sexual conduct be admitted, notwithstanding the fact that the evidence would otherwise be excluded by the rape shield law." *Pulizzano*, at 331. The Wisconsin Supreme Court was looking at the right question. The issue before us is whether it was unreasonable in light of *Chambers* and *Davis* to conclude that Dunlap's rights were not violated.

Both *Chambers* and *Davis* are fact-based decisions. Chambers was accused of murder arising out of an incident in Woodville, Mississippi. One Saturday evening in 1969, two Woodville policemen—James Forman and Aaron "Sonny" Liberty—entered a local bar and pool hall to execute a warrant for the arrest of a man named C.C. Jackson. Jackson resisted and a hostile crowd of some 50 people gathered. When the officers attempted to handcuff Jackson, a number of men intervened and wrestled him free. Forman radioed for help and Liberty took a 12-gauge, sawed-off shotgun from the officers' squad car. Ultimately, five or six pistol shots were fired, and Liberty was hit several times in the back. Before he died, Liberty fired his

---

[1] Dunlap emphasizes that recent Confrontation Clause cases show that the Court is giving added importance to the Sixth Amendment, citing *Blakely v. Washington*, 124 S. Ct. 2531 (2004), *United States v. Booker*, 125 S. Ct. 738 (2005), and *Crawford v. Washington*, 541 U.S. 36 (2004). However, he does not argue that the decision in his case is an unreasonable application of these recent cases. As does Dunlap, we take seriously, however, the Court's renewed interest in Sixth Amendment jurisprudence.

gun into an alley in the direction from which the shots toward him were fired. As the crowd in the alley scattered, Liberty deliberately fired a second shot, which hit Chambers. Officer Forman could not see which of the men shot Liberty. Another officer testified that he saw Chambers do the deed. Yet another officer said he could not see whether Chambers had a gun, but he saw Chambers "break his arm down" shortly before shots rang out. Liberty was taken to a hospital, where he was dead on arrival.

Another man named Gable McDonald may have been in the crowd that evening. Sometime after the shooting, he gave a sworn confession to Chambers' attorneys saying that he was the one who shot Officer Liberty. He also said that he had previously told a friend that he did the shooting. A month later, at Chambers' preliminary hearing, McDonald repudiated his confession and said he was not even present at the shooting but was down the street drinking beer with a friend.

When Chambers went to trial, one of his defenses was that McDonald, not he, was the shooter. He called McDonald as a witness in an attempt to place his confession before the jury. This effort was thwarted by a Mississippi rule of evidence, which held that a party may not impeach his own witness, and by the rule against hearsay. The court refused to find that McDonald was an "adverse" witness, and this precluded cross-examination which would have put McDonald's repudiated confession before the jury. When Chambers tried to call three witnesses to whom McDonald had also allegedly admitted that he was the shooter, the evidence was likewise excluded. The Mississippi Supreme Court upheld each ruling.

The United States Supreme Court reversed, saying that in "these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat

the ends of justice." The Court also pointed out that the decision "establish[ed] no new principles of constitutional law" nor did the decision "signal any diminution in the respect traditionally accorded to the States in the establishment and implementation of their own criminal trial rules and procedures." *Chambers*, at 302, 303.

*Davis v. Alaska* is similarly fact-specific. When the Polar Bar in Anchorage closed one February evening in 1970, there was over a thousand dollars in its safe. At about midday the next day, the safe was missing. Later that day, Alaska State Troopers received word that a safe was discovered about 26 miles outside Anchorage near the home of Jess Straight. It turned out to be the safe from the bar, and it had been pried open and emptied out. Richard Green, Straight's stepson, told the troopers that he had seen and spoken with two men standing alongside a car near where the safe was discovered. Green picked a picture of Davis out of a six-person photo array. Davis was arrested the next day. The day after that, Green picked him out of a lineup.

Green was a crucial witness for the State. But he had a juvenile record. Prior to trial, the State moved for a protective order to prevent any mention of the record. Defense counsel wanted to use the record to show that Green could have fingered Davis to shift suspicion away from himself. Additionally, Green could have been concerned about jeopardizing his own freedom—he was on probation at the time. In other words, his record would have been useful to Davis to show bias and prejudice and not to call Green's general character into question.

The trial court granted the motion for a protective order, relying on Alaska Rule of Children's Procedure 23, which stated, in essence, that in most cases, juvenile dispositions are not admissible as evidence during judicial proceedings. The Alaska Supreme Court affirmed the conviction on

the basis that defense counsel was able to adequately question Green regarding possible bias or prejudice without using Green's juvenile record.

The Supreme Court determined that the "accuracy and truthfulness of Green's testimony were key elements in the State's case . . . ." At 317. In that circumstance, the Court said:

> Serious damage to the strength of the State's case would have been a real possibility had petitioner been allowed to pursue this line of inquiry. In this setting we conclude that the right of confrontation is paramount to the State's policy of protecting a juvenile offender.

At 319.

The question for us is whether the Wisconsin Supreme Court's decision in Dunlap's case amounts to an unreasonable application of these cases. First of all, we note that the court was well aware that

> evidence of a sexual assault complainant's sexual history may be admitted over the rape shield law to protect the defendant's constitutional right to present a defense.

*Dunlap*, 640 N.W.2d at 118. The court noted that admissibility determinations required a balancing of the interests of the parties. In that context, the court set out the five criteria that must be met, under *Pulizzano*, before the rape shield law gives way. Concentrating on the second criterion—whether the acts the defendants wants admitted closely resemble those in the present case—the court determined they did not. The acts Dunlap was accused of—touching Jamie's buttocks and vagina—were found to be not sufficiently like Jamie's alleged prior sexual behavior to warrant admission of the evidence.

Certain principles intersect in our analysis of whether this decision is unreasonable. The first is that the Confrontation Clause standards are very general. We have remarked that

> rulings on Confrontation Clause issues are very fact-specific and involve case-by-case determinations. At the same time, and perhaps for that very reason, the Confrontation Clause standards are very general, making it difficult to call a state court ruling in this area "objectively unreasonable."

*Walker v. Litscher*, 421 F.3d 549, 557 (7th Cir. 2005). In *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004), the Court discussed rules which are general in nature and the fact that a very general rule allows for a good deal of leeway in reaching decisions:

> [T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

Additionally, the very standard set out in § 2254 limits our analysis. As the Supreme Court discussed in *Williams v. Taylor*, the Antiterrorism and Effective Death Penalty Act (AEDPA) "modifies the role of federal habeas courts in reviewing petitions filed by state prisoners." At 403. Prior to the enactment of AEDPA in 1996, federal courts, on habeas, made independent determinations regarding the constitutionality of state court rulings. As *Williams*

*v. Taylor*, at 411, makes clear, after AEDPA, that is no longer the case:

> [A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

Interestingly for our current discussion, the way AEDPA has altered our role is starkly apparent in three of our habeas cases involving rape shield laws. Relief was denied in all three cases. However, prior to AEDPA, in *Stephens v. Miller*, 13 F.3d 998 (7th Cir. 1994), Indiana's law underwent our almost painful, independent *en banc* scrutiny (11 judges participated), which resulted in six separate opinions plus the opinion of the court. In contrast, since 1996, consistent with AEDPA, our opinions give far greater deference to the state courts. *See Hammer v. Karlen*, 342 F.3d 807 (7th Cir. 2003); *Pack v. Page*, 147 F.3d 586 (7th Cir. 1998). In *Hammer*, the state court determined that the evidence Hammer wished to present was not highly relevant and that his interest in presenting it was outweighed by the State's interest in protecting the privacy of sexual assault victims under Wisconsin's rape shield law. Citing *Hennon v. Cooper*, 109 F.3d 330, 334 (7th Cir. 1997), we said that for a petitioner to obtain relief, "the state court must not only have reached an incorrect result, but a truly 'unreasonable' one. . . . Thus, if the state court's decision is 'at least minimally consistent with the facts and circumstances of the case,' the federal court is powerless to grant relief." *Hammer*, at 810. In *Pack*, the Illinois Appellate Court had also applied a balancing approach under which the trial judge had discretion to weigh the competing interests of the parties under the Illinois statute. We said that when federal constitutional law calls for the exercise of discretion, if a petitioner has a full opportunity to litigate the issue, a

responsible, thoughtful decision is adequate to support the judgment. We also noted that the fact that we might not have reached the same result were we considering the case on direct appeal "is beside the point." At 589.

In the present case, we cannot find that the Wisconsin Supreme Court decision is an unreasonable application of established law as set out by the U.S. Supreme Court in *Chambers* or *Davis*. A highly significant factor is that the Wisconsin court recognized that its rape shield law must yield if it would deprive a defendant of his constitutional rights.

To repeat, Dunlap wanted to cross-examine the Child Protective Services investigator Hanson about a statement in her 1989 report that Susan Smith expressed concern about Jamie's "seductive behavior," including touching men in the genital area, "humping the family dog," and masturbation. As we said, the Wisconsin Supreme Court's focus was on whether the acts the defendant wished to present closely resembled those involved in the present case, a factor which is relevant to the balance which must be struck between the defendant's rights and the state's interest in protecting the victim. The court found that the acts were not sufficiently similar, a finding which we simply can't judge to be unreasonable.

Additionally, we think it is important to note the reasons for which Hanson's testimony was offered by the State, what that testimony was, and the reasons the trial judge rejected Dunlap's request to cross-examine her. First, the reason it was offered. The defense cross-examination of Jamie was intense and revealed certain inconsistencies between what she told Hanson when she was 6 years old and what she said both in the preliminary hearing and the trial when she was 15. It is fair to say that the cross-examination was vigorous—much as it would have been had Jamie been an adult at the time of trial, say nothing of at

the time of the incident. Summing up what had been testified to so far on cross-examination, counsel asked the following questions and received positive answers to each:

First of all, on one occasion you have indicated in you[r] statement right after this happened that you and Shawn and Mr. Dunlap were present and most recently you stated only you and Mr. Dunlap were present, correct?

. . . .

And you also testified or you stated in 1989 that Mr. Dunlap did not insert his finger into you and most recently in March of 1998 [at the preliminary hearing] you stated that he did insert his finger in you, is that correct?

. . . .

And also in 1989 you stated that he never said what would happen to you if you told anybody and most recently in March of 1998 you said that if you told anybody he told you that—he told you that he would kill your parents, correct?

Other questions were asked about whether she had ever met Dunlap before the night in question, whether she had ever been in the house before, etc. This sort of questioning of a then-15-year-old girl about what happened when she was 6 years old went on at some length. On redirect, the prosecution asked what was probably the only necessary question: "Jamie, you were six years old when this happened?"

Not content to rest on that obvious point, however, the prosecution called Hanson to testify. The focus of her testimony was on what a 6-year-old understands, thinks, and remembers. She discussed the ability of a 6-year-old to understand various concepts, such as "in" and "out" as it

refers to something being put inside their genitalia. She also testified that young children often engage in progressive disclosure of events, giving only the "tip of the iceberg" in an initial interview, perhaps because they are embarrassed or just want to get the interview over with. Hanson also was asked whether Jamie's behavior during her interview was consistent with the behavior of a child sexual assault victim. The answer was yes. This was the only time that her testimony touched on whether Jamie was an abuse victim.

The defense argued that the latter question led to the conclusion that it was Dunlap who had assaulted Jamie. To undermine this conclusion, the defense wanted to present the other remarks from Hanson's report—the information about Jamie's sexual precociousness supplied by Susan Smith. The problem was that Smith had died and there had been no investigation into whether her statements were true. They were included in the report, Hanson said, only to give social workers a full picture of what might be happening. The trial judge excluded the evidence, saying both that Hanson was testifying primarily about characteristics of 6-year-olds so the information was not relevant, and that Smith was not subject to cross-examination so the reliability of the evidence was in question.

Unlike the evidence excluded in *Chambers*, the statements attributed to Smith do not "directly affect[ ] the ascertainment of guilt . . . ." *Chambers*, at 302. That Jamie might have been abused on a prior occasion does not mean Dunlap did not abuse her as well on November 7, 1989. Obviously, also, the evidence here was not nearly so reliable or relevant as that excluded in *Davis*; that is, an official court record that went directly to the possible bias of a star witness. It cannot be said that the Wisconsin Supreme Court's decision upholding the exclusion of this evidence is grounded on an unreasonable application of *Chambers* or *Davis*.

Accordingly, the judgment of the district court is AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*